UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANIEL J. SULLIVAN<br><br>                              Plaintiff,<br><br>                   v.<br><br>WILLIAM K. WOODRUFF, III,<br>WOODRUFF FAMILY, LTD. and<br>OPTICAL SWITCH CORPORATION<br>                              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
05-CV-10310-MLW

**(ORAL ARGUMENT REQUESTED)**

### DEFENDANTS' MOTION TO DISMISS
### AND MEMORANDUM IN SUPPORT

Comes Now, Defendants WILLIAM K. WOODRUFF, III, WOODRUFF FAMILY, LTD. and OPTICAL SWITCH CORPORATION and pursuant to Rule 12 of the Federal Rules of Civil Procedure file Defendants Motion to Dismiss and Memorandum In Support (the "Motion"). As set forth more fully in the Motion, Plaintiff's declaratory judgment action should be dismissed for two reasons. First, this Court does not have personal jurisdiction over the Defendants who are all citizens of Texas that do not have sufficient minimum contacts with the State of Massachusetts. Second, there is no basis for federal subject matter jurisdiction over plaintiff's state law declaratory judgment action. In what is a case of blatant forum shopping, Plaintiff filed this declaratory judgment action although there is already pending in Dallas, Texas a live action for damages based on the same issues and facts that are raised in Plaintiff's declaratory judgment action pending in this Court. In support hereof Defendants would show as follows:

## FACTUAL BACKGROUND

1.   Defendant Optical Switch Corporation ("OSC") is a Texas corporation.

2.   Defendant William K. Woodruff, III, ("Woodruff") is a Texas resident and citizen of the State of Texas.

3.   Defendant Woodruff Family Ltd. ("WFL") is a Texas family limited partnership domiciled in Dallas, Texas.

4.   Plaintiff Daniel J. Sullivan ("Sullivan") is a citizen of the State of Massachusetts.

5.   None of the Defendants have ever been citizens of the State of Massachusetts, or resided in Massachusetts.

6.   There is currently pending in the State of Texas a lawsuit involving both Plaintiff and Defendants styled:  OSC SHAREHOLDER LITIGATION TRUST, OPTICAL SWITCH CORPORATION, AND WILLIAM K. WOODRUFF, III, INDIVIDUALLY, AND ON BEHALF OF WOODRUFF FAMILY LIMITED v. HOLOGRAPHIC LITHOGRAPHY SYSTEMS, INC., GARY P. NABHAN, DANIEL J. SULLIVAN, BAKER BOTTS, L.L.P., CYNTHIA DOW, ROBERT GIORDANO, WILLIAM MCCARTHY, BARRY COFFMAN, WILL VOLKMANN, CAUSE NO. CC-04-13245-C, DALLAS COUNTY COURT AT LAW NO. 3 (hereinafter, the "Texas Lawsuit").  A true and correct copy of the petition in the Texas Lawsuit is attached hereto as Exhibit A.

7.   Plaintiff Daniel J. Sullivan is a defendant in the Texas Lawsuit.

8.   The Defendants in this declaratory judgment action (OSC, Woodruff, and WFL) are also plaintiffs in the Texas Lawsuit and are seeking damages against Mr. Sullivan based solely on state law claims and causes of action arising under the laws of the State of Texas.  [*See*

Exhibit A, *passim*]. The Texas Lawsuit was filed on November 12, 2004.  Daniel Sullivan was added as a defendant on February 10, 2005.

9.     The Texas Lawsuit is based on acts and omissions by Mr. Sullivan while he was a director of OSC, a Texas corporation.  As a director of OSC, Mr. Sullivan violated Texas blue-sky laws and breached his fiduciary duty to OSC, the Texas company for which he was a director and shareholder.  Defendants Woodruff and WFL also are prosecuting claims against Sullivan in the Texas Lawsuit.  Prior to becoming a director at OSC, Sullivan made certain material, false representations and omissions to Woodruff and WFL in connection with the sale of securities in a company Sullivan owned.

10.     On or about January 31, 2005 Plaintiff filed an action in Massachusetts state court seeking declaratory relief that he is not liable for the claims and causes of action that are pending against him in the Texas Lawsuit.

11.     Defendants timely removed Plaintiff's state court declaratory judgment action to this Court on February 16, 2005.

## ARGUMENT

### A.     Personal Jurisdiction

12.     Defendants do not have minimum contacts with the State of Massachusetts.

13.     Without minimum contacts, there is no personal jurisdiction over Defendants and, therefore, dismissal is proper under FED. R. CIV. P. 12(b)(2).

14.     In addition to lack of minimum contacts, the exercise of personal jurisdiction in this case does not comport with traditional notions of fair play and substantial justice.  There is already pending in Dallas, Texas a lawsuit for damages which encompasses all of the claims and issues for which Plaintiff is seeking declaratory relief from this Court.  [*See* Ex. A].

**B.    Subject Matter Jurisdiction**

15.    It does not appear that there is an independent basis for subject matter jurisdiction over Plaintiff's action.  Plaintiff is seeking a declaration of rights of the parties based on a provision of Massachusetts state law that affords declaratory relief.  Federal subject matter jurisdiction or diversity jurisdiction is not present.

16.    Furthermore, under the Supreme Court precedent in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942), "it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties." *See also National Railroad Passenger Corp. v. Providence and Worcester Railroad Co.*, 798 F.2d 8 (1st Cir. 1986)(upholding stay of declaratory judgment action in federal court where issued raised  were same as those in state court); *Employers Insurance of Wausau v. Unisys Corporation*, 103 F.3d 129 (6th Cir. 1996) (upholding stay of declaratory judgment action in Wisconsin federal court where New Jersey state court had jurisdiction over pending action presenting identical issues based on New Jersey state law and where same facts and parties were before the state court).

17.    This Court should dismiss or stay the declaratory judgment action based on the rationale in *Brillhart* which has been adopted in this circuit.  The Texas Lawsuit is in a more advanced stage than the declaratory judgment action pending in Court.  *See id*.  The present action will require this Court to adjudicate issues based on Texas state law.  Dismissal of this action will avoid piecemeal litigation and inconsistent results that will likely occur if both this action and the Texas Lawsuit proceed simultaneously.  *National Railroad Passenger Corp.*, 798 F.2d at 11 (stating that where "federal action is one for declaratory relief concerning an issue pending in a state action . . . the desirability of avoiding piecemeal litigation is entitled to great

deference").  Judicial and legal economy militates in favor of the Texas Lawsuit because the vast majority of witnesses, documents and legal counsel are in Texas.  Plaintiff Sullivan has Texas counsel and has been active in the Texas Lawsuit.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

## CONCLUSION

18.  For the reasons stated herein, Defendants request that the Court grant this Motion and award such other relief as is proper.

Dated:  May 19, 2005

Respectfully submitted,

**BOYD & ASSOCIATES**

/s/ Kirk A. Kennedy
***Samuel L. Boyd, P.C.***
State Bar No. 02777500
***Kirk A. Kennedy***
State Bar No. 00794080

600 University Tower, LB 48
6440 N. Central Expressway
Dallas, Texas  75206
(214) 696-2300
(214) 363-6856 (fax)

AND


JOHN N. LEWIS & ASSOCIATES


Lawrence R. Mehl (BBO#566235)
JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109
(617)523-0777

*Attorneys for* **WILLIAM K. WOODRUFF, III,
WOODRUFF FAMILY, LTD. and
OPTICAL SWITCH CORPORATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, a copy of the foregoing Defendants' Motion to Dismiss and Memorandum In Support was served via electronic mail and U.S. Mail upon counsel for the Plaintiff, Victor H. Polk, Jr., Bingham McCutchen LLP, 150 Federal Street, Boston, MA  02110.


/s/ Kirk A. Kennedy____
Kirk A. Kennedy                      May 19, 2005

CAUSE NO. CC-04-13245-C

| | | |
|---|---|---|
| OSC SHAREHOLDER LITIGATION TRUST, OPTICAL SWITCH CORPORATION, AND WILLIAM K. WOODRUFF, III, INDIVIDUALLY, AND ON BEHALF OF WOODRUFF FAMILY LIMITED, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE COUNTY COURT |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§<br>§ | AT LAW NO. 3 |
| HOLOGRAPHIC LITHOGRAPHY SYSTEMS, INC., GARY P. NABHAN, DANIEL J. SULLIVAN, BAKER BOTTS, L.L.P., CYNTHIA DOW, ROBERT GIORDANO, WILLIAM MCCARTHY, BARRY COFFMAN, WILL VOLKMANN, WASSERSTEIN PERELLA, INC. n/k/a DRESDER, KLEINWORT WASSERSTEIN, INC., and KERRY NORTH, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§<br>§ | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' FOURTH AMENDED PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

**COME NOW**, OSC SHAREHOLDER LITIGATION TRUST, OPTICAL SWITCH CORPORATION, and WILLIAM K. WOODRUFF, III, Individually, and on Behalf of WOODRUFF FAMILY LIMITED, and file this Fourth Amended Petition and respectfully show unto the Court as follows:

PLAINTIFFS' FOURTH AMENDED PETITION – Page 1

## I.

### DISCOVERY CONTROL PLAN

1.1.    Plaintiffs intend this case to be conducted under a Level 3 Discovery Control Plan pursuant to TEX. R. CIV. P. 190.4. Plaintiffs request that the Court enter a scheduling order governing this matter.

## II.

### PARTIES

2.1.    Plaintiff OSC SHAREHOLDER LITIGATION TRUST (hereinafter the "Litigation Trust") is a Litigation Trust whose trustee, William Roever, is located in Dallas County, Texas. The Litigation Trust is the assignee of certain claims and causes of action including, but not limited to, claims of Tudor Investment Corporation of Greenwich, Connecticut and Petros Capital L.L.C.

2.2.    Plaintiff OPTICAL SWITCH CORPORATION (hereinafter "OSC") is a Texas corporation with its principal place of business located in Dallas County, Texas.

2.3.    Plaintiff WILLIAM K. WOODRUFF, III, is an individual residing in Dallas County, Texas.

2.4.    Plaintiff WOODRUFF FAMILY LIMITED (hereinafter "WFL") is a domestic limited partnership in the State of Texas located in Dallas County, Texas.

2.5.    Defendant    HOLOGRAPHIC    LITHOGRAPHY    SYSTEMS,    INC. (hereinafter "HLS") is a foreign corporation organized and existing under the laws of the State of Delaware. HLS has engaged in business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042. Among other acts, HLS contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State.

HLS was required to appoint and maintain a registered agent in Texas for service of process but it has failed to do so. Therefore, HLS may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044. The Secretary of State shall then mail a copy of the process to HLS by and through its President and Chief Executive Officer, Daniel Sullivan, who resides at 141 Forest Street, Wellesley, Massachusetts, 02481, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045.

2.6.    Defendant GARY P. NABHAN (hereinafter "Nabhan") is an individual who may be served with process at his place of residence located at 6416 Northport Drive, Dallas, Texas 75230.

2.7.    Defendant DANIEL J. SULLIVAN (hereinafter "Sullivan") is an individual, former director of OSC, and non-resident of Texas. Sullivan was doing business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042. Among other acts, Sullivan contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State. Therefore, Sullivan may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044. The Secretary of State shall then mail a copy of the process to Sullivan via Certified Mail, Return Receipt Requested, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), to his home address at 141 Forest Street, Wellesley, Massachusetts 02481.

2.8.    Defendant ROBERT GIORDANO (hereinafter "Giordano") is an individual and non-resident of Texas. Giordano was doing business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042. Among other acts, Giordano

contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State. Therefore, he may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044. The Secretary of State shall then mail a copy of the process to Giordano via Certified Mail, Return Receipt Requested, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), to his home address located at 23 Friar Tuck Circle, Summit, New Jersey 07901.

2.9.    Defendant WILLIAM MCCARTHY (hereinafter "McCarthy") is an individual and non-resident of Texas. McCarthy was doing business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042. Among other acts, McCarthy contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State. Therefore, he may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044. The Secretary of State shall then mail a copy of the process to McCarthy via Certified Mail, Return Receipt Requested, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), to his address at 301 Fox Hill St., Westwood, Massachusetts 02090.

2.10.    Defendant BARRY COFFMAN (hereinafter "Coffman") is an individual and non-resident of Texas. Coffman was doing business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042. Among other acts, Coffman contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State. Therefore, he may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE §

17.044.  The Secretary of State shall then mail a copy of the process to Coffman via Certified Mail, Return Receipt Requested, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), to his address at 34 Carleton Drive, Needham, Massachusetts 02492.

2.11.  Defendant WILL VOLKMANN (hereinafter "Volkmann") is an individual and non-resident of Texas.  Volkmann was doing business in the State of Texas pursuant to TEX. CIV. PRAC. & REM. CODE § 17.042.  Among other acts, Volkmann contracted by mail or otherwise with a Texas resident and committed a tort in whole or in part in this State.  Therefore, he may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044.  The Secretary of State shall then mail a copy of the process to Volkmann via Certified Mail, Return Receipt Requested, pursuant to TEX. CIV. PRAC. & REM. CODE § 17.045(a), to his address at 69 Hampshire, Wellesley, Massachusetts 02481.

2.12.  Defendant BAKER BOTTS L.L.P. (hereinafter "Baker Botts") is a Texas limited liability partnership that may be served with process by serving its managing partner at its principal place of business located at 910 Louisiana Street, Houston, Texas 77002.

2.13.  Defendant CYNTHIA DOW (hereinafter "Dow") is an individual and at all times relevant a Texas resident who may be served with process at her place of business, Cadbury Schweppes, 900 King Street, Rye Brook, New York 10573 during normal business hours.

2.14.  Defendant WASSERSTEIN PERELLA, INC. n/k/a DRESDNER KLEINWORT WASSERSTEIN, INC. (hereinafter "Wasserstein") is a foreign corporation

organized and existing under the law of the State of New York.   Wasserstein engaged

in business in the State of Texas pursuant to Tex. Civ. Prac. & Rem. Code § 17.042.

Among other acts, Wasserstein contracted by Mail or otherwise with a Texas resident

and committed a tort in whole or in part in this State.   Wasserstein was required to

appoint and maintain a registered agent in Texas for service of process but it has failed

to do so.   Therefore, Wasserstein may be served with process by serving the Texas

Secretary of State, 1019 Brazos Street, Austin, Texas 78701 pursuant to Tex. Civ.

Prac. & Rem. Code § 17.044.   The Secretary of State shall then mail a copy of the

process to Wasserstein by and through its President and Chief Executive Officer at

1301 Avenue of the Americas, New York, NY 10019, pursuant to Tex. Civ. Prac. & Rem.

Code § 17.045.

2.15.   Defendant KERRY NORTH (hereinafter "North") is an individual who may

be served with process at his place of residence located at 3909 Shenandoah St.,

Dallas, TX 75205.

## III.

### JURISDICTION & VENUE

3.1.    This Court has jurisdiction and venue is proper in Dallas County, Texas.

This case involves an amount in controversy that exceeds the minimum jurisdictional

limits of this Court.   Moreover, venue is proper in Dallas County pursuant to Tex. Civ.

Prac. & Rem. Code § 15.002(a)(1) because Plaintiffs' causes of action accrued in Dallas

County, Texas and all or a substantial part of the events or omissions giving rise to the

claims brought herein occurred in Dallas County.   Venue is further proper in Dallas

County under Tex. Civ. Prac. & Rem. Code § 15.002(a)(2) because Defendant Nabhan,

a natural person, is a resident of Dallas County.  Finally, venue is proper in Dallas

County against all other Defendants under TEX. CIV. PRAC. & REM. CODE § 15.005.

## IV.

### DEMAND FOR JURY TRIAL

4.1.    Plaintiffs assert their right to trial by jury and hereby request a jury trial in

this case.

## V. .

### FACTUAL BACKGROUND – PART I
### "THE HLS INVESTMENT"

**A.    Gary Nabhan**

5.1.    Defendant Gary Nabhan became an employee of a company known as

William K. Woodruff & Co., Inc. (hereinafter "WKW & Co.") around July or August 1997.

WKW & Co. was an investment banking firm in Dallas, Texas managed by its President,

William K. Woodruff, III (hereinafter "Woodruff").  Nabhan worked for Woodruff in the

investment banking industry on several different occasions and the two men had known

each other for over twenty (20) years.  Nabhan's work at WKW & Co. in 1997 involved

managing Woodruff's family estate and managing litigation involving the Woodruff family

and its companies.  It was Nabhan who helped organize WFL, the limited partnership

that controlled Woodruff's personal and family investments.

5.2.    Woodruff and his wife Cayla considered Nabhan to be a trusted family

advisor and friend.  In over two decades the Woodruffs developed a mutual relationship

of trust and confidence with Nabhan; a confidential relationship under Texas law.   In

1997, Woodruff's wife, Cayla, became seriously ill with poly-cystic kidney disease.  In

order to better manage his professional business and attend to his ailing wife, Woodruff asked Nabhan to help manage and protect Woodruff's personal and family estate. As a result of the confidential relationship between the Woodruffs and Nabhan, WFL entrusted Nabhan with unrestricted authority to manage and protect the Woodruff family's investments. In addition Woodruff granted a power of attorney to Nabhan. As Woodruff's attorney-in-fact and fiduciary, Nabhan was given unrestricted authority to make investments on WFL's behalf without any supervision, knowledge, control, or other input from Woodruff. In return, Nabhan was liberally compensated. Nabhan received, initially, a salary in the amount of $240,000 per year plus ten percent (10%) of all investments made and ten percent (10%) of all net profits received.

## B.    Daniel J. Sullivan and HLS

5.3.    In early 1998, Nabhan contacted his best friend and college roommate, Defendant Daniel J. Sullivan. Sullivan was the President, CEO, and largest shareholder of Holographic Lithography Systems, Inc. (Defendant HLS) a start-up technology company located in Bedford, Massachusetts. Sullivan advised Nabhan that he was developing a business plan for HLS and needed to raise $5 million in capital. Sullivan asked Nabhan to review the HLS business plan and provide advice on how to raise capital for the company. At that time, HLS was negotiating with Hewlett Packard about the purchase of one of HLS' lithography tools. HLS needed funds to complete development of this order.

5.4.    Shortly after being contacted by Sullivan, Nabhan and Sullivan agreed to pursue an immediate investment in HLS by Woodruff. Not only was a multi-million dollar investment in HLS part of their plan but Nabhan and Sullivan put together a much

broader and more devious scheme: Nabhan and Sullivan would use Nabhan's trust relationship with Woodruff for their own benefit. In early 1998, Nabhan traveled to Bedford, Massachusetts allegedly to attend a presentation on HLS and obtain more information about the company. While in Bedford, and without conducting any meaningful due diligence, Nabhan recklessly agreed to invest $2,000,000 of WFL funds and Woodruff family money in HLS. Nabhan informed Woodruff that he intended to make a $2,000,000 investment on WFL's behalf. However, Nabhan did not disclose to Woodruff or WFL any of the pertinent discussions that occurred between Sullivan and Nabhan about the high risk of the investment, including the critical fact that there was a serious question whether HLS could survive as a "going concern." Woodruff believed that Nabhan, as a trusted advisor and fiduciary, was acting in his and WFL's best interest and, therefore, was negotiating the best possible terms in exchange for his $2,000,000 purchase of HLS stock. Unfortunately for the Woodruff family, this was not the case.

5.5.    On or about June 12, 1998, Nabhan sent a letter to Sullivan to confirming his intention to invest $2,000,000 of Woodruff's money in HLS in exchange for ten percent (10%) of the equity ownership of the company. At the time, ten percent (10%) ownership interest converted to approximately 19,047 shares of convertible preferred stock reflecting a share price of **$105.00 per share**. The anticipated closing was scheduled for August 31, 1998 with an initial payment of $1,000,000 and a second payment of $1,000,000 on December 31, 1998. On August 31, 1998, Nabhan executed formal closing documents for the $2,000,000 stock investment on behalf of WFL. WFL was issued 20,672 shares of Series C Preferred Stock in HLS reflecting a price of

**$96.75 per share**.    After Nabhan invested his beneficiary's $2 million in HLS, he was given a seat on the HLS Board of Directors.

5.6.    Unfortunately for Woodruff, Nabhan knew, but failed to disclose that just a few months before the closing of Woodruff's $2,000,000 stock purchase, insiders of HLS, including Sullivan, had purchased HLS stock - the same HLS stock that Woodruff/WFL purchased for $96.75 per share - for **$4.55 per share or approximately five percent (5%) of the price paid by WFL**.    Nabhan also failed to disclose to Woodruff or WFL that no one had ever purchased stock in HLS at a price higher than **$18.87 per share** either before or after this transaction.    Nabhan failed to disclose to Woodruff what the actual purchase price per share of the stock was at the time or what it had been in the past.    Nabhan caused Woodruff to pay **almost $80.00 per share more** than anyone had ever paid or offered to pay in what was a grossly unfair transaction for Woodruff yet a windfall for HLS, Sullivan, and his associates.    Nabhan, Sullivan, HLS and its directors continued thereafter to conspire and conceal "their secret" from Woodruff and WFL, the "beneficiaries" of the trust relationship with Nabhan.

5.7.    Nabhan also knew yet never disclosed to Woodruff or WFL that Sullivan (HLS' President and largest shareholder) had invested only $591,041.78 into HLS in return for 56,311 shares of convertible preferred stock representing a 37% ownership interest in the company.    Yet, when Woodruff questioned Nabhan about the existing capitalization of HLS Nabhan told Woodruff that Sullivan—Nabhan's buddy and college roommate—**had invested $7,000,000** cash in HLS.    Sullivan invested about one-fourth of what Woodruff invested in HLS yet received three times the stock . . . completely

incomprehensible and a gross violation by Nabhan of his fiduciary duties, joined by the complicitous HLS Board of Directors.

5.8.    Woodruff had no idea that WFL was by far the largest investor in HLS and that WFL was the only investor in HLS to ever pay $96.75 per share. Further, neither Woodruff nor WFL knew that the $2,000,000 investment in return for 20,672 shares of stock and a 13% minority ownership interest in the company was grossly unfair and disproportionate to the deal given to every single other investor in HLS. Nabhan's set up of Woodruff and WFL was successfully hidden from Woodruff because Woodruff had no reason to fear Nabhan or to protect himself and his family from his trusted friend. Woodruff and WFL did not learn of these material facts until many years later.

5.9.    Nabhan and certain HLS directors acting through Nabhan, represented to Woodruff and WFL on several occasions that Woodruff's investment in HLS was a prudent one and that HLS and its technology were valuable. Nabhan and HLS made these representations without disclosing the grossly inflated share price Nabhan suggested and agreed to pay as Woodruff's fiduciary. Nabhan knew and concealed the extreme level of financial risk inherent in HLS including the risk that HLS lacked the ability to remain in business. In fact, Nabhan, HLS and its directors knew yet failed to disclose that HLS was in dire financial straits and was desperately in need of cash. HLS had been seeking outside investors for some time but none would fund; that is except for Nabhan, who was generous to Sullivan and HLS with Woodruff's and WFL's money. Nabhan did a huge favor for his college buddy, notwithstanding his simultaneous deception of a man to whom he owed the highest duties of loyalty and care. Nabhan failed to negotiate a fair ownership position in HLS for WFL. Even so,

HLS was destined to failure as the company never generated enough revenue to pay its expenses. Woodruff and WFL were wrongly lured into a losing venture by a trusted advisor; one who breached every duty of loyalty and care that he owed to Plaintiffs Woodruff and WFL.

**VI.**

### FACTUAL BACKGROUND – PART II
### "FRAUD AT OSC"

6.1.    After the HLS investment was complete, Nabhan and Sullivan continued to use Woodruff and WFL as their conduits to obtain further access to millions of dollars and other corporate opportunities all to the detriment of the Woodruffs and later, to innocent third parties.  The HLS investment closed in August 1998 with final payment being made in January 1999.  Soon thereafter, Nabhan convinced Woodruff to allow him to take over another of Woodruff's major investments, a company called Optical Switch Corporation.  Woodruff became involved in OSC in July 1997.  OSC's business plan was to produce fiber optics equipment for use in the telecommunications industry. Woodruff, through his various entities and/or partnerships, owned over 50% of the OSC stock and effectively controlled the company.

## A.    Nabhan Takes Control of OSC

6.2.    In the Fall of 1998, business at OSC had been going poorly.  The company was forced to make key personnel changes due to an unacceptable failure to timely develop technology under milestones set out in funding agreements between the founder of OSC and Woodruff.  Woodruff advised Nabhan that he was unhappy with OSC's failures and that Nabhan needed to shut down the company.

6.3.    Instead of following Woodruff's directive to shut down OSC and close-out Woodruff's OSC investment, Nabhan convinced Woodruff that he needed to continue OSC's operations.    Nabhan volunteered to take over the company in an attempt to "save" OSC.    Nabhan stated that in order to take care of things, he would need Woodruff and his co-investors to give up all control over OSC.    Nabhan did this by requiring them to give their proxies to him.    Because of the long history Woodruff had with Nabhan and because of the confidential and fiduciary relationship that existed between them, Woodruff consented.

6.4.    In November 1998, Nabhan assumed control at OSC.    By way of proxies from Woodruff and other co-investors, Nabhan engineered his own appointment as the President, CEO, and Chairman of the Board of OSC.    While Nabhan was well compensated by Woodruff, he negotiated, for his own benefit additional compensation and/or benefits from OSC without full disclosure to Woodruff.    The OSC Board of Directors changed from a 7 member board to a 3 member board thus giving Nabhan control of the company.    Once in place, Nabhan continued his plan to illegally divert money from Woodruff and further benefit himself, Sullivan, and HLS in the process. Part of that plan included a conspiracy by Nabhan, Sullivan and others to fabricate value in OSC in hopes of taking the company public with an initial public offering ("IPO") thereby reaping huge profits for themselves.

**B.    Nabhan Consolidates Power at OSC**

6.5.    In December 1998, unbeknownst to Woodruff, Bart Stuck, an OSC shareholder, made an offer to buy out Woodruff's position in OSC.    Nabhan refused the offer without conferring with Woodruff.    Nabhan realized that if Woodruff sold his

position in OSC to Bart Stuck, that would jeopardize Nabhan's ultimate plan of taking OSC public and reaping huge profits for himself and his co-conspirators.    At that time, Woodruff was extremely disappointed in the company's performance and would have accepted the offer given that OSC was virtually worthless and had no technology of any proven value.

6.6.    It was around this same time that Nabhan became hostile to Richard Laughlin, the Chief Technical Officer at OSC.    Nabhan's agenda was to eliminate anyone who might challenge his control over the company and its technology.    Nabhan fired Laughlin from OSC and filed an arbitration proceeding that cost OSC and its largest shareholder, Phase III Holdings, Inc., approximately $1,725,827.00 when the arbitrator entered a judgment adverse to OSC and Phase III Holdings (the "Laughlin Arbitration").    The *Laughlin Arbitration* was particularly harmful because it drained OSC and its primary source of funding (Phase III Holdings) of much needed cash.    The arbitration was unnecessary and a great waste of scarce OSC assets.    Yet, it was another part of Nabhan's scheme to consolidate his power over OSC by eliminating one of OSC's founders.    Again, had Woodruff known of Bart Stuck's genuine interest in purchasing Woodruff's stock in OSC, he would have sold his stock, avoided the significant financial losses connected with the *Laughlin Arbitration*, and avoided Nabhan's fraudulent and illegal actions (described below) that would cause significant harm to Woodruff, OSC, and its shareholders.

## C.    The "Sophisticated" Proof of Concept

6.7.    In June 1999, Nabhan convinced Woodruff that OSC needed another $2 million in cash in order to move OSC to "proof of concept" by September 1999.  "Proof

of concept" was a key due diligence qualification to obtaining critical equity funding by October-November 1999.  At that time, OSC had about $199,000 in cash, no lines of credit, or commitments for funding.  In Nabhan's own words, if he did not raise money from somewhere, it was "between here and the end of the road."  Woodruff was also upset about OSC's lack of progress and general the state of affairs.  Woodruff and his wife, Cayla, were distressed about Nabhan's request for more cash.  However, Nabhan assured them this would be the last money he would need. Nabhan assured Woodruff that the $2 million would enable OSC to reach "proof of concept" by December 1999 thereby positioning OSC to raise additional equity financing from outside investors. Based on Nabhan's representations, Woodruff loaned OSC $2 million including $900,000.00 that Woodruff borrowed from his Individual Retirement Account ("IRA"). Nabhan assured Woodruff that the money would be returned before Woodruff would incur any tax liability for borrowing from his IRA.  Of course, that did not occur. Woodruff lost his IRA money and suffered a significant tax liability due to Nabhan's deceit.

### D.    Sullivan's Investment in OSC While HLS Is Failing

6.8.    While problems at OSC continued in 1999, HLS had its own set of problems.  HLS' financial condition continued to deteriorate.  The company was unable to obtain any external financing or venture capital and HLS still had no viable products to market.  HLS senior management (i.e., Sullivan) notified the company's directors of its deteriorating financial condition.  Sullivan spearheaded nationwide efforts to try and sell all or part the company in 1999.  However, not a single offer was forthcoming and neither was there any interest from venture capital sources.  In late 1999 while

Sullivan's company was rapidly burning through scarce funds, Sullivan began investing money in OSC to help his friend Nabhan prop up OSC for the "big score" in 2000. While HLS was deteriorating financially, Sullivan's wife invested $200,000 in OSC Series A Preferred Stock. Other close colleagues of Sullivan including certain HLS directors also made commitments to fund OSC. From January 2000 to March 31, 2000 shareholders of HLS injected $1.2 million into OSC while at the same time HLS was deteriorating financially. These cross-company contributions by HLS insiders could not be explained absent the Nabhan-Sullivan connection which apparently was intended to leverage a failed investment in HLS into valuable stock in OSC. While Woodruff paid $96.75 per share to invest in HLS, Sullivan began investing in OSC at a price of $0.77 per share shortly before the OSC equity offering in 2000. Sullivan and other HLS Directors and shareholders were pumping money into OSC to keep it afloat until OSC obtained additional financing with which they intended to purchase HLS, a failing company with "going concern" problems.

6.9.    With Woodruff's additional $2 million commitment to keep OSC going, Nabhan placed Defendant Sullivan on the OSC Board of Directors in December 1999. Nabhan and Sullivan virtually controlled both companies. In December 1999, Nabhan was in the process of putting together a private offering of OSC preferred stock to raise $50-$70 million from outside investors. Nabhan, Sullivan, and others intended to use OSC investor money to prop-up HLS without informing OSC investors.

**E.    OSC's Lawyers**

6.10.    On or about October 11, 1999, Defendant Cynthia Dow joined OSC as its general counsel. Three days later, on October 14, 1999, Defendant Dow was appointed

Vice-President and Assistant Secretary of OSC and given authority to execute legal documents on behalf of OSC and take actions in Nabhan's absence. Prior to joining OSC, Dow was an attorney at Baker Botts in the firm's labor and employment section. Defendant Baker Botts was OSC's primary outside legal counsel and corporate securities counsel at all times relevant. The firm billed OSC for hundreds of thousands of dollars in legal fees from 1999 to 2001. In addition, while simultaneously representing OSC, Defendant Baker Botts was also attorneys for William Woodruff and the Special Committee of OSC's Board of Directors in connection with OSC's sale of $50 million of OSC stock to HLS in May 2000.

## F.    The PPM and Defrauded Series B Investors

6.11   In the Fall of 1999, Defendants Nabhan, Dow and Baker Botts prepared a Private Placement Memorandum (the "PPM") that was sent to potential investors on or after December 24, 1999. The Defendants' goal was to raise at least $50 to $70 million in private equity from accredited investors pursuant to Regulation D promulgated under the Federal Securities Act of 1933. The offering period for the OSC Series B Preferred Shares was initially intended to close on January 31, 2000. However, because the offering was oversubscribed, it was extended to the end of February 2000 and then again to March 31, 2000. According the subscription agreements executed by each investor, the closing of sales of OSC Series B Preferred Stock was to occur at the law offices of Baker Botts in Dallas, Texas. Despite the fact that OSC was barely able to survive and had no marketable products, the PPM stated that OSC expected to generate revenues approaching **$6 billion** over the next six years. The PPM contained pro forma financial data that was not based on sound accounting principles. The PPM

also represented to investors that OSC had achieved a "sophisticated proof of concept" for an optical switch, was positioned to dominate the optical switch industry, and had technology that was "one year ahead of the nearest competitor."

6.12. The investors who purchase the Series B Preferred Stock in OSC considered the representations made in the PPM important information. Among those representations as stated above, was the false representation that OSC had achieved a "sophisticated proof of concept" on or before December 24, 1999 that positioned OSC to [then] *dominate* the "billion dollar optical switch market." In fact, unbeknownst to investors these statements were false and incredibly misleading. Defendants Nabhan, Baker Botts, and Dow in assembling, drafting and distributing the PPM also failed to disclose other material facts such as the fact OSC's auditors published "going concern" problems for OSC on October 11, 1999, a little more than two months before the PPM was sent to investors. In particular, OSC's auditors stated that "conditions [at OSC] raise substantial doubt about the company's ability to continue as a going concern." The PPM's December 24, 1999 offering date was key to these Defendants' deceit since in another week OSC would be insolvent and still have "going concern" problems. These facts were confirmed again by OSC's auditors as of December 31, 1999 but never disclosed to prospective investors.

6.13. The fraudulent PPM was an important piece in the puzzle. Defendants used OSC to successfully defraud institutional investors and others out of more than $58 million obtained by way of fraud, misrepresentations, and material omissions. Some of the institutional investors are beneficiaries of the OSC Shareholder Litigation Trust. Of course, none of these investors would have invested in OSC if they had been

made aware of the company's true financial condition of insolvency, the fact that the company's technology had not achieved a "sophisticated proof of concept" and was not positioned to dominate the optical switch market, and the fact Nabhan, Dow, and Sullivan intended to divert the money raised from the Series B investors to (i) facilitate OSC's acquisition of a worthless company, HLS and (ii) subsidize HLS' unsuccessful operations and development.

**G.    The Rescue of HLS With Series B Investor Funds**

6.14.  In December 1999, at the same time Nabhan, Dow and Baker Botts were soliciting investors with the PPM, Sullivan and Nabhan first began to publicly discuss OSC acquiring HLS.  Of course, the acquisition was concealed from the investors, most of whom closed their purchases of OSC Series B Preferred Stock before OSC publicly disclosed its intention to acquire HLS in a Supplemental PPM dated March 24, 2000; too little, too late and still misleading.  The objective of this scheme was for OSC to raise at least $50 to $70 million in capital from investors (i.e., the beneficiaries of the Litigation Trust), who thought they would be investing solely in OSC's optical switch technology, then OSC would turn around and use the money to rescue a failing HLS. This transaction would enable Sullivan and the HLS shareholders to leverage their worthless investment in HLS from about $1.3 million into a $43 million windfall.  The acquisition of HLS would also generate substantial legal fees for Defendant Baker Botts. All of this would occur to the detriment of not only Woodruff but to the innocent investors who were not given full and timely disclosure concerning OSC's proposed and unnecessary acquisition of HLS.  In the end, OSC would reflect a capitalization well

exceeding $508 million positioning the company for an IPO at major multiples. This would compound the fraud orchestrated by Nabhan and Sullivan but make them rich.

6.15. In order to facilitate the fraudulent stock sale to the Series B investors Nabhan first had to "clean-up" OSC's highly leveraged balance sheet. In October 1999 Nabhan represented to the holders of certain convertible debentures that OSC was on the verge of achieving a proof of concept that would enable him to raise substantial equity financing by December 2000. Nabhan convinced the convertible debenture holders to convert $6.5 million in debt into a new series of convertible preferred stock (the OSC Series A Convertible Preferred Stock) that would terminate their rights as creditors and place them in parity with the new stock to be issued pursuant to the PPM (i.e., Series B Convertible Preferred Stock). The Series B Preferred Stock would ultimately be used as consideration for the assets of HLS. But that acquisition could not occur unless Nabhan could persuade holders of the debentures to convert their debt into preferred stock in OSC thus making them pari passu with the Series B and part of a pool of approximately $114 million, versus the former status as preferred creditors with claims of approximately $6.5 million. Absent the Series A conversion, the Series B equity funding would not have been successful because of OSC's debt level.

6.16. Well before the $58 million Series B equity financing of OSC concluded, OSC began taking overt formal steps to acquire HLS. Defendants were aware of this probable acquisition all along yet omitted this material information in the December 24th PPM to the Series B investors. In mid-March 2000, Defendant Baker Botts began preparing a supplemental PPM that was ostensibly intended to disclose OSC's intention to acquire HLS (the "Supplemental PPM"). However, the Supplemental PPM was not

distributed to investors until March 24, 2000 – just seven days before the offering period for the Series B Preferred Stock was to close.  Only those Series B investors who purchased Series B Preferred Stock after March 24, 2000 had an opportunity, if any, to obtain information about the acquisition of HLS.

6.17.  In March 2000, OSC hired the investment banking firm of Wasserstein Perella, Inc. ("Wasserstein") to give a "fairness opinion" regarding the proposed acquisition of HLS.  That opinion was issued about one month later at a price of $250,000. The lead investment banker at Wasserstein was Kerry North, a former partner at Baker Botts.  Upon information and belief, Mr. North was referred to OSC by Baker Botts' corporate securities attorneys.   At all times relevant, including the period when Wasserstein and in particular Kerry North was conducting due diligence on HLS and during Wasserstein's presentation to the OSC Board of Directors on or about May 18, 2000, Wasserstein failed to disclose material facts and events pertaining to the financial condition of HLS.  Moreover, Wasserstein's "fairness opinion" in which it represented to OSC, the Special Committee of OSC's Board and to OSC's minority shareholders that HLS had assets and/or value of $50 million, was a material misrepresentation that induced OSC to sell nearly $50 million of Series B Preferred Stock to HLS in exchange for worthless HLS assets.

6.18.  On or about May 19, 2000, OSC and HLS executed an asset purchase agreement whereby OSC sold $50 in OSC Series B Preferred Stock to HLS–the same preferred stock that had been sold to outside investors—in exchange for HLS assets. This ill-advised transaction was particularly harmful to OSC and its shareholders because at the time, HLS was not worth $50 million and was in deteriorating financial

condition near irreversible insolvency. For example, HLS's independent auditor, Shuman & Associates, reported on March 19, 2000, that in 1999 HLS had suffered recurring losses from operations that raised **"substantial doubt"** about its ability to continue as a "**going concern.**"   HLS financial statements showed that the company had net operating losses in 1999 of $1,354,999.02.   Notwithstanding the net operating losses and the auditors' going concern disclosure, Nabhan, Sullivan, North, Dow, Baker Botts, Wasserstein and other conspiring Defendants caused OSC to pay $50 million for HLS' assets which were basically worthless; **a $50 million fraud on OSC and its shareholders.**   Baker Botts in particular knew well in advance of the transaction that HLS did not have more than $10 million in assets, because corporate counsel at Baker Botts required HLS to make a representation in the stock purchase agreement that the value of HLS' assets did not exceed $10 million thus obviating any filing required with the Antitrust Division of the Department of Justice under Hart Scott Rodino. Nevertheless, Baker Botts failed to advise the OSC Special Committee of this critical fact.

6.19.   Following the sale of $50 million of OSC Series B Preferred for HLS assets, Nabhan and Sullivan asserted that OSC had a post money valuation of well over $500 million notwithstanding their knowledge that "HLS' alleged $50 million of assets" were of negligible value, if any, to OSC or anyone else.   In truth, little, if any, of the technology HLS owned was useful to OSC's engineers, who were frustrated with having to use and wait on the products to ship from Massachusetts to Texas.   Both OSC's sales and engineering teams complained that the HLS technology was **useless.** The $50 million HLS acquisition was a financial farce and was designed, implemented,

and railroaded by Nabhan and Sullivan and others – all to the HLS conspirators benefit and to OSC's and its shareholders' severe detriment. OSC was damages (not including exemplary damages) by the transaction in excess of the $508 million, the post-money value of OSC, according to one or more defendants, before the HLS transaction.

6.20. The "rescue" of HLS orchestrated by Nabhan, Sullivan, Dow, North, Baker Botts, Wasserstein and others caused real and substantial harm to both OSC and the Litigation Trust beneficiaries who had purchased the Series B Preferred Stock less than two months before. Had the Defendants not conspired to "ram through" the acquisition of HLS, and if Nabhan were truly acting in the company's best interest, it is likely that OSC would have survived, and the holders of the Series B Preferred Stock would not have lost their entire investment of $58 million. Following the acquisition of HLS, Nabhan transferred millions of dollars that OSC raised from the sale of OSC Series B Preferred Stock to Bedford, Massachusetts so that Sullivan and his associates could attempt to turnaround a failing "HLS operation," all of which was not disclosed to most of the Series B investors before they purchased stock in OSC; an unbelievable windfall for HLS and its shareholders and a huge detriment to OSC's stated goal of dominating the optical switch market. The damages suffered by the Series B Investors exceed $58 million (not including exemplary damages) and the damages suffered by OSC exceed $508 million (not including exemplary damages).

6.21. Woodruff continued to care for his seriously ill wife Cayla, who had a kidney transplant in April 2001. However, by December 2001 Woodruff realized that Nabhan had wasted his investments and had nothing to show for it. Only after Woodruff re-inserted himself into his business was he able to realize the full extent of what had

happened and the Defendants' undisclosed recklessness. By the time Woodruff became aware of Nabhan's betrayal of trust, fraud, and mismanagement of his business interests, the damage done by the Defendants was so severe that Woodruff and OSC were left financially crippled. After the predestined failure, and subsequent to eye-opening discovery in related arbitration, it became necessary to file the instant litigation.

6.22. The Litigation Trust beneficiaries were not aware of the material misrepresentations and omissions of facts surrounding the sale of OSC Series B Preferred Stock and the Defendants' violations of the Texas Securities Act until after the Original Petition in this matter had already been filed. Had the Litigation Trust beneficiaries known (i) that OSC was not in fact ready to dominate the multi-billion dollar optical switch market, (ii) that Nabhan, Sullivan, Dow, HLS, and others were scheming to divert the proceeds from the sale of OSC Series B Preferred Stock into an ill-conceived asset purchase of HLS and (iii) that the intended purpose was to enrich the Defendants at the Plaintiffs' expense, they never would have invested in OSC. These carefully concealed facts were only discovered years later.

## VII.

### CAUSES OF ACTION

**A.    FRAUD AND MISREPRESENTATION**

7.1.    All of the preceding allegations are incorporated herein.

7.2.    Nabhan, Sullivan, HLS, Dow, North, Wasserstein and Baker Botts, by and through the business entities' vice-principals, employees, servants, agents, ostensible agents, and/or representatives, in the course of their dealings with Plaintiffs, made the following fraudulent and material, false representations by affirmative fake

representations and/or material omissions of fact in order to induce Plaintiffs to invest and/or maintain investments in HLS and/or OSC:

### 1.    WFL Purchase of HLS Stock

a.    That it was prudent for WFL to invest in HLS;

b.    That a $2,000,000 HLS investment in return for a 13% ownership interest in the company was a fair investment;

c.    That Nabhan's college roommate and HLS' President, Sullivan, had invested $7,000,000 into HLS;

d.    That WFL's $2,000,000 investment in return for a 13% minority ownership interest in HLS was proportionate to the existing paid-in capital of the company;

e.    Omitted to disclose that WFL's $2 million investment was being made at a per-share price of $96.75, nearly twenty times that paid by HLS insiders for the same stock in the months immediately preceding the investment;

f.    Omitted to disclose that WFL's investment was being made at a per-share price of nearly five times that of the highest price ever paid for the same stock prior to or since the investment;

g.    Omitted to disclose that HLS stock was selling at $4.55 per share just weeks before Plaintiff's $2,000,000 investment, which was made at a price of $96.75 per share;

h.    Omitted to disclose that Sullivan had invested just $591,041.78 into HLS, in return for 56,311 shares of convertible preferred stock for a 37% ownership interest;

i.    Omitted to disclose that no one had ever paid more than $18.87 per share for HLS stock;

j.    Omitted to disclose that WFL's $2,000,000 investment in HLS was the largest investment ever made in the company yet WFL only received a modest 13% ownership interest in HLS;

### 2.  Bart Stuck's Offer to Purchase Woodruff's OSC Stock

a.    Omitted to disclose that Bart Stuck had offered to buy out Woodruff's position in OSC.

### 3. $2 Million loan from WKW

a.    That Nabhan would repay Woodruff the $2 million loan before Woodruff incurred any tax penalty for taking money out of his IRA;

b.    That Nabhan would sell enough stock to repay monies borrowed from Mr. and Mrs. Woodruff.

### 4.  Series B Investors

a.    That a "sophisticated proof of concept" had been achieved prior to the issuance of the PPM on December 24, 1999;

b.    That the proof of concept which OSC had achieved was such a technological such that OSC was [then] positioned to dominate the multi-billion dollar optical switch market;

c.    That OSC's fiber optics technology was one year ahead of its nearest competitor;

d.    Omitted to disclose that OSC was insolvent by December 24 and had "going concern" problems;

e.    Omitted to disclose that Nabhan, Sullivan, Dow and HLS set out to use the Litigation Trust beneficiaries' funds to save HLS and enrich themselves by preparing OSC for a fraudulent IPO;

f.    Omitted to disclose to Series B investors that monies raised from OSC would be diluted and diverted to unrelated, non-optical switch uses at HLS;

g.    Omitted to disclose that HLS was virtually insolvent, had no viable technology, and was not worth the purported $50 million purchase price;

h.    Omitted to disclose that HLS directors and shareholders were pumping money into OSC in an attempt to keep that company afloat until the Series B equity financing was "on its feet" and an acquisition of HLS could be achieved;

i.    Omitted to disclose that Sullivan, and perhaps other HLS insiders, were front running through Sullivan's wife the Litigation Trust beneficiaries' investment;

j.    Omitted to disclose material information concerning conflicts of interest of OSC's financial advisors, attorneys and principals; and

k.      Omitted to disclose that all of the acts pertaining to the sale of OSC Series B Preferred Stock and the HLS acquisition were orchestrated by Defendants with the purpose of fabricating OSC's capitalization to ultimately enrich the Defendants with a view to a greater fraudulent offering through an IPO with Wasserstein Perella & Co.

### 5. OSC's Sale of Series B Preferred Stock to HLS

a.      That HLS was a successful company with valuable technology and a high likelihood of success;

b.      Omitted to disclose that HLS was in dire financial straits and was operating under a "going concern" risk;

c.      Omitted to disclose that Baker Botts was simultaneously representing OSC, William Woodruff and the Special Committee of OSC in connection with the sale of $50 million of OSC Series B Preferred Stock to HLS; and

d.      Omitted to disclose that HLS had less than $10 million worth of assets; and

e.      That HLS was worth nearly $50 million and that the sale of nearly $50 million in OSC stock in exchange for the assets of HLS was fair to OSC and its minority shareholders.

7.3.    At the time Nabhan, Sullivan, HLS, Dow and Baker Botts, by and through the business entities' vice-principals, employees, servants, agents, ostensible agents, and/or representatives, made said material misrepresentations and/or material omissions of fact; at various times they either knew these representations were false, or recklessly made them as positive assertions without knowledge of their truth.

7.4.    Nabhan, Sullivan, HLS, Dow, North, Wasserstein and Baker Botts, by and through the business entities' vice-principals, employees, servants, agents, ostensible agents, and/or representatives, made these material misrepresentations and/or material omissions of fact in order to induce Plaintiffs to rely on and act upon them.

7.5.    Woodruff and/or WFL relied upon the material misrepresentations and/or material omissions of fact made by Nabhan, Sullivan and HLS, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, in allowing and making the HLS investment through Nabhan, his fiduciary.  Plaintiffs Woodruff and WFL further relied upon these material misrepresentations and/or material omissions of fact in making/ continuing his OSC investment and putting Nabhan in a position of authority and control over OSC.

7.6.    As a result of these actions, Nabhan and HLS, by and through its principals, employees, servants, agents, ostensible agents, and/or representatives, induced WFL to make an investment in HLS at a price far in excess of the fair market value for the stock purchased.  Not only was this investment not made at fair market value, Nabhan and others knew the company was suffering under a "going concern risk" and predestined to failure.

7.7.    Later, Defendants induced Woodruff to continue with the OSC investment and place both Nabhan and Sullivan in positions of authority at OSC.  Once Nabhan and Sullivan were firmly in place at OSC, Defendants continued to induce Woodruff/ WFL to support OSC's operations.

7.8.    Defendants also induced the Litigation Trust beneficiaries to invest in OSC without knowledge of the material omissions and untrue facts as discussed above.

7.9.    HLS, by and through its principals, employees, servants, agents, ostensible agents, and/or representatives, was a party to and participant in this fraudulent scheme.  Therefore, not only is HLS liable for the actions of its principals, employees, servants, agents, ostensible agents, and/or representatives, it is also liable

for the independent actions, if any, of Nabhan and Sullivan in furtherance of that scheme.

7.10.  HLS benefited immensely from the fraudulent actions taken by Nabhan and Sullivan and, therefore, it is also liable as a principal in the fraud.

7.11.  HLS, as a participant in the fraud, caused Plaintiffs to suffer huge financial losses and caused Woodruff and his family to suffer severe emotional distress and mental anguish.

**B.    FRAUD IN STOCK TRANSACTION PURSUANT TO § 27.01 OF TEX. BUS. & COM. CODE**

7.12.  All the preceding allegations are incorporated herein.

7.13.  Nabhan, Sullivan, and HLS are also liable to Plaintiffs for statutory fraud in a stock transaction pursuant to § 27.01 OF TEX. BUS. & COM. CODE.  The sale of HLS stock to WFL, the sale of OSC Series B Preferred Stock to the Litigation Trust beneficiaries, and the $50 million asset acquisition of HLS in return for OSC Series B stock all qualify as "transaction(s) involving . . . stock in a corporation."

7.14.  Nabhan, Sullivan, and HLS, by and through the entities', its vice-principals, employees, servants, agents, ostensible agents and/or representatives, made material false representations for the purpose of inducing WFL to purchase $2,000,000 of HLS stock.  Further, at various times all of the Defendants made material false representations for the purpose of obtaining investments in OSC by the Litigation Trust beneficiaries, and in connection with the $50 million stock for HLS assets transaction.  Plaintiffs relied on these representations.  As a result, Defendants are liable to the Plaintiffs for actual damages incurred as a result of the fraud described herein.

**PLAINTIFFS' FOURTH AMENDED PETITION – Page 29**

## C.    CONSPIRACY

7.15.  All the preceding allegations are incorporated herein.

7.16.  Nabhan conspired with Sullivan, Dow, North, Wasserstein, Baker Botts, HLS, and/or its vice-principals, employees, servants, agents, ostensible agents, and/or representatives, and other defendants named herein, to commit fraud and other illegal acts that damaged Plaintiffs.

7.17   The Defendants' actions at times alone and at other times in combination, resulted in Woodruff/WFL paying far in excess of the fair market value for its Series C Preferred Stock in HLS.   The Defendants' actions to conceal Nabhan's fiduciary breaches and fraud also resulted in Woodruff/WFL maintaining their investment in OSC and allowing  Nabhan and Sullivan to take positions of authority and control in OSC.

7.18.  Further, the Defendants' deceitful actions caused the Litigation Trust beneficiaries to purchase the OSC Series B Preferred Stock.  In addition, Defendants' actions culminated with the HLS bogus asset acquisition in return for $50 million worth of OSC Series B Preferred Stock.

7.19.  Nabhan acted in combination with HLS and its vice-principals, employees, servants, agents, ostensible agents, and/or representatives, and the other defendants. The fraud was implemented Nabhan inserting himself into all facets of Woodruff's financial affairs ostensibly to assist or benefit Woodruff and WFL but primarily to enrich himself and later Sullivan even to the detriment of Woodruff.   Nabhan convinced Woodruff/WFL to maintain the OSC investment in order that Defendants could lure the Litigation Trust beneficiaries into investing in OSC's optical switch business; yet much of

the investor funds were diverted away from OSC's optical switch business to the HLS operations in Massachusetts.

7.20. Acting in concert with each other, Nabhan, Sullivan, and HLS, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, induced Plaintiff WFL to invest $2 million in HLS Series C Stock at a price **fraudulently inflated** far in excess of its fair market value; later obtained and control of OSC; convinced Woodruff/WFL to maintain the OSC investment; lured the Litigation Trust beneficiaries to invest in OSC; and thereafter diluted the Litigation Trust beneficiaries investment with a fraudulent asset purchase from HLS.  Defendants' actions at various times alone and at other times in consultation with each other were taken in an effort to defraud the Plaintiffs and enrich the Defendants.

7.21. Nabhan and HLS, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, were united in their efforts to help Nabhan con his beneficiary out of $2 million for HLS stock far in excess of the fair market value at the time; to later establish Nabhan and Sullivan in positions of authority at OSC; to convince Woodruff/ WFL to maintain the OSC investment; to obtain funding from the Litigation Trust beneficiaries; and to divert $50 million of those funds to the Defendants benefit.  That was the course of action Defendants devised irrespective of when other defendants joined the conspiracy.  There was a meeting of the minds between Nabhan, Sullivan, and HLS, by and through its vice-principals, employees, servants, agents, ostensible agents, and/or representatives and the other defendants as time progressed.  Further, the Defendants' meeting of the minds spanned the timeframe

from the HLS investment through the time that Nabhan and Sullivan were ousted from OSC.

7.22.  The actions of Defendants proximately caused WFL to purchase $2 million in HLS Series C Stock at a price fraudulently inflated far in excess of its fair market value.  As a result, WFL did not receive adequate consideration for the single largest amount paid into the HLS as an investment.  It also lost the opportunity to invest these funds in a worthwhile and honest investment.  In addition, the Defendants conspired with the objective to cause Plaintiffs to maintain a worthless investment in OSC in order to place themselves in a position to enrich themselves, even if to the detriment of the Woodruff family's assets and OSC.

7.23.  The Defendants further conspired to lure multi-million dollar investments from the Litigation Trust beneficiaries, and to divert those funds from OSC's optical switch business to the failing HLS operations, as well as the bogus $50 million sale of OSC Series B Preferred Stock for assets of HLS.

**D.    BREACH OF FIDUCIARY DUTY**

7.24.  All the preceding allegations are incorporated herein.

7.25.  A relationship of trust and confidence, a confidential relationship, existed between the Woodruff family and WFL, on the one hand, and Nabhan, on the other hand.  Not only was there a relationship of confidence, but Nabhan was acting directly under a Power of Attorney executed on behalf of WFL.  Therefore, both an informal and a formal fiduciary duty to the Woodruffs and WFL in the various securities transactions which Nabhan executed on behalf of WFL.   The same was true for the other investments made and maintained by Nabhan.  This duty was a high duty of good faith,

fair dealing, honest performance and strict accountability. Nabhan used the trust he acquired from the Woodruffs and WFL and he betrayed that trust. He took the confidence and trust that Woodruff and WFL placed in him and he betrayed them. Furthermore, Sullivan and HLS knowingly participated and conspired with Nabhan in his violations of his fiduciary duties to the Woodruffs and WFL.

7.26. HLS, Nabhan, and Sullivan, by and at various times through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, made a concerted effort to unlawfully benefit Nabhan, Sullivan, HLS and its shareholders to the detriment of Nabhan's beneficiaries. As part of their joint scheme, Sullivan arranged for Nabhan to become an HLS Director, while Sullivan became an OSC Director. Their joint conduct from and after 1998 created a maze of fiduciary conflicts and concealed actions that violated Nabhan's fiduciary obligations to Woodruff and his entities. Nabhan had conflicting fiduciary duties to the Woodruffs, WFL, OSC and HLS. Sullivan had conflicting fiduciary duties to HLS and OSC. Despite the obvious conflicts of interest created by these Defendants, they engaged and promoted a fraudulent Series B Preferred Stock offering with the ultimate objective to close a bogus $50 million transaction for a failing, illiquid HLS. By creating a bogus capitalization, Nabhan and Sullivan believed they would enrich themselves through a prospective, fraudulent IPO. Being obedient to one fiducial beneficiary was disloyal to the conflicted fiducial beneficiary(ies).

7.27. Nabhan gained his position as CEO, President, and Chairman of the Board at OSC, because of his fiduciary relationship with Woodruff. He had no experience in the high tech industry nor did he have formal educational training for that

business. Nonetheless, Nabhan owed both Woodruff and OSC the highest of all duties – the fiduciary duties of good faith, fair dealing, absolute loyalty, full disclosure, honest performance, and strict accountability.

7.28. Nabhan breached his fiduciary duties to Woodruff, WFL and OSC by failing to properly execute his obligations of absolute loyalty and care. Nabhan used his position of authority conferred upon him by Woodruff to close a bogus HLS stock deal, obtain control of OSC and place Sullivan in a similar position of authority at OSC. As directors of OSC, Nabhan and Sullivan collectively breached their fiduciary duties of loyalty and care by orchestrating the fraudulent OSC offering and the bogus $50 million HLS asset acquisition while both Defendants were fiduciaries to both entities; OSC, the buyer, and HLS, the seller. The other Defendants knew of these conflicts but facilitated breaches for their own personal enrichment. Neither fiduciary disclosed to investors nor OSC and its board that HLS was in serious financial jeopardy, having significant "going concern issues" which seriously jeopardized its financial and operational survival. Instead, Nabhan and Sullivan collectively influenced HLS insiders to buoy OSC which anticipated a sizable round of institutional and individual investments from the Litigation Trust beneficiaries. Nabhan and Sullivan crafted a scheme for execution after the institutional and individual investments whereby Sullivan's deteriorating HLS investment would be saved by some form of acquisition of HLS by OSC, all of which was to the severe detriment of OSC. Yet, by increasing OSC's capitalization, Defendants believed that OSC would have greater IPO or acquisition potential. Nabhan, Sullivan, and HLS, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, took steps to ensure that HLS' stock transaction with OSC was

structured such that HLS (and indirectly its shareholders) would receive stock in an amount grossly exceeding HLS' fair market value under any financial formula, all of which was successfully done without making disclosures required by law and all to the serious losses of OSC and its shareholders which losses exceed (not including exemplary damages) $508 million and $58 million respectively.

7.29. Reasonable investors under the same or similar circumstances as Plaintiffs would attach importance to the material facts, whether falsely represented or omitted, in deciding whether to make the HLS investment and whether to make or maintain the OSC investment. Because of the fiduciary relationship between Nabhan and WFL, Woodruff and/or WFL did not have a duty to investigate the transactions. Woodruff and WFL justifiably relied upon Nabhan as a trusted business advisor and fiduciary to act in their best interests, as well as OSC's best interests in making and managing investments on behalf of WFL and OSC. Nabhan breached his fiduciary duties in every regard with Sullivan and other Defendants helping Nabhan pull of his heist of the Woodruffs and OSC.

7.30. Nabhan also expected to benefit from this transaction by receiving 10% of the value of all investments made by WFL. WFL was damaged as a proximate result of making the $2,000,000 investment in HLS stock, maintaining the OSC investment, and allowing the HLS acquisition to take place, all for which the involved Defendants should be held accountable.

7.31. Defendants HLS and other defendants were knowing participants in these breaches of fiduciary duty by Nabhan and Sullivan. Therefore, Texas law holds them jointly and severally liable for all damages caused by Nabhan. As a proximate result of

the actions taken by Defendants, OSC was damaged by being induced by the Defendants' orchestration of a grossly unfair and overreaching asset purchase transaction whereby OSC purchased virtually worthless "HLS assets" for $50 million of OSC's Series B Preferred Stock which had real value.  Once that acquisition occurred, Nabhan and Sullivan had rescued Sullivan's failing, virtually insolvent company and positioned themselves for further enrichment through another, prospectively fraudulent IPO, all to the loss of OSC's shareholders and the Litigation Trust beneficiaries.

E.    BREACH OF CONTRACT

7.32.   All of the preceding allegations are incorporated herein.

7.33.   On August 25, 1998, Woodruff executed a written Power of Attorney to Nabhan to act as his true and lawful attorney in fact, with full power substitution to act on behalf of WFL in connection with the $2,000,000 purchase of HLS stock.  Therefore, this contract imposed a duty upon Nabhan to act as a fiduciary for WFL in this transaction.  Nabhan breached the contract to act as WFL's fiduciary when he failed to act in WFL's best interests and negotiated a $2,000,000 purchase of HLS stock with his buddy and college roommate at a vastly inflated price per share in view of the extreme technological and operational risks affecting HLS.  Plaintiffs sustained financial harm as a result of Nabhan's breach of this contract.

7.34.  In addition, both Nabhan and Sullivan breached the confidentiality agreements they entered into with OSC upon becoming Directors and/or Officers. These agreements provided that they would not disclose proprietary information about the company to outsiders.  Both Nabhan and Sullivan disclosed proprietary information in furthering their scheme with the HLS-related defendants.  In addition, Sullivan, with

Nabhan's approval, used disclosed proprietary information about OSC to front run the Litigation Trust beneficiaries, and get in on the OSC "deal" well in advance of the HLS asset acquisition. Sullivan's misuse of that information enabled him to leverage a small investment in OSC a .77 into a believed windfall, again at the expense of the OSC shareholders and Litigation Trust beneficiaries.

**F.    VIOLATIONS OF THE TEXAS SECURITIES ACT**

7.35.    All of the preceding allegations are incorporated herein.

7.36.    Defendants violated Section 33 of the Texas Securities Act ("TSA") by making materially untrue statements and material omissions in connection with WFL's $2,000,000 purchase of HLS stock. Among other things, Defendants represented that HLS had valuable technology, was a good investment, and that the fair market value of shares in the company was at a price of $96.75 per share. None of those representations were true. Defendants also omitted to disclose that HLS directors had recently purchased stock for $4.55 per share. Woodruff and WFL would not have approved such a purchase at $96.95 per share. Woodruff and WFL would not have made the $2,000,000 HLS investment but for the Defendants' untrue statements and material omissions.

7.37.    As the result of the fraudulent acts of Defendants, Woodruff and WFL have suffered injury in that they were induced to purchase $2,000,000 worth of HLS stock when there was a "going concern" risk and insiders had purchased the stock for about 1/20[th] of the price a few months earlier. In addition, Plaintiffs Woodruff and WFL were induced to place Nabhan in a position of authority, where he and the other Defendants continued to plot and scheme against them.

7.38.  Defendants Nabhan, Sullivan, Dow and Baker Botts violated Section 33 of the Texas Securities Act codified at TEX. REV. CIV. STAT. 581-33 et seq. by making material untrue statements and material omissions to OSC investors in connection with the offer and sale of OSC Series B Preferred Stock and, as such, are primary violators of the TSA.  These include Defendants' false representations that a **"sophisticated proof of concept"** had occurred, that OSC was positioned to **"dominate the multi-billion dollar optical switch market"**, and the **correlative omissions** regarding of OSC's lack of technical progress and desperate financial condition or insolvency.  The investors who purchased the OSC Series B Preferred Stock were unable to make an informed investment decision because of these fraudulent acts.

7.39.  Defendants Nabhan, Dow, Sullivan and Baker Botts are **also liable** to Plaintiffs under Article 581-33(F) of the TSA as control persons and aiders.  The facts show that these Defendants directly or indirectly controlled OSC and others in connection with the offer and sale of OSC Series B Preferred Stock.  The facts show that Defendants Dow and Baker Botts also directly or indirectly, with the intent to deceive or defraud or with reckless disregard for the truth, **materially aided** OSC, Nabhan and others in connection with the sale of OSC Series B Preferred Stock.

7.40.  Defendants Sullivan, Giordano, McCarthy, Coffman, and Volkmann are also liable to the Litigation Trust under Article 581-33(F) as persons who directly or indirectly, with the intent to deceive or defraud or with reckless disregard for the truth, **materially aided** OSC, Nabhan and others in connection with the sale of OSC Series B Preferred Stock.

7.41.  Defendants HLS, Sullivan, Giordano, McCarthy, Coffman, Volkmann, and Nabhan violated Article 581-33(B) of the TSA by selling HLS' bogus "assets" in return for $50 million worth of OSC Series B Preferred Stock by means of untrue statements, and omissions of material facts.   These Defendants, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives, in the course of its dealings with OSC, made untrue statements and omissions of material fact as detailed above in connection with the purchase of OSC Series B Preferred Stock by HLS.  Without those untrue statements and omissions of material fact, OSC would not have sold $50 million in OSC Series B Preferred Stock in exchange for near worthless assets of HLS.

7.42.  With respect to the sale of OSC Series B Preferred Stock to HLS, Nabhan, Sullivan, Giordano, McCarthy, Coffman, Volkmann, and HLS are all "control persons" pursuant to Section 33(F) of the Texas Securities Act with regard to each of the TSA violations described herein.   Furthermore, these Defendants, along with their vice-principals, employees, servants, agents, ostensible agents and/or representatives of HLS, aided each other in all of the fraudulent acts made the basis of this action. Therefore, they are **jointly and severally liable** pursuant to the Texas Securities Act.

7.43.    With respect to the sale of OSC Series B Preferred Stock to HLS, Defendant Baker Botts was a key link in the chain of events leading to the sale by virtue of its material omissions and material misstatements to OSC as the seller of securities and therefore is liable to OSC as a (i) primary violator, (ii) "control person" and (iii) material aider in different contexts pursuant to Section 33(F) of the Texas Securities Act with regard to each of the TSA violations described herein.   Furthermore, because

Defendant Baker Botts, along with its vice-principals, employees, servants, agents, ostensible agents and/or representatives aided each of the other Defendants in all of the fraudulent acts made the basis of this action, it is **jointly and severally liable** pursuant to the Texas Securities Act.

7.44.  With respect to OSC's sale of OSC Series B Preferred Stock to HLS, Defendants Wasserstein and Kerry North are also liable under the TSA Article 581-33-1 as investment advisors and investment advisor representatives.  Wasserstein and Kerry North committed fraud and/or engaged in a fraudulent practice as those terms are defined in TEX. REV. CIV. STAT. Article 581-4 in rendering investment services to OSC, the Special Committee of the OSC Board of Directors and to OSC's minority shareholders.  Moreover, Wasserstein and Kerry North were key links in the chain of events leading to OSC's sale of $50 million of OSC Series B Preferred Stock to HLS and, therefore, are also liable under TEX. REV. CIV. STAT. Article 581-33(F) both as primary violators and as material aiders regarding each of the TSA violations described herein insofar as they relate to OSC's sale of stock to HLS.

7.45.  As a result of Defendants' fraudulent actions, the deceived investors who participated in the Series B OSC financing, contributed over $58 million in capital to the company without disclosure of material facts relating to HLS's financial distress and want of market value, when the offering funds were anticipated to be applied to undisclosed HLS-related business.

7.46.  Thereafter, the Defendants' fraudulent actions caused OSC to pay $50 million for the bogus assets of HLS which were not worth even a fraction of that amount.

7.47.  Plaintiffs were required to hire Boyd & Associates to prosecute this action. Under the terms of the Texas Securities Act, Plaintiffs are entitled to reasonable and necessary attorney's fees and costs.

## G.    UNJUST ENRICHMENT

7.46.  All of the preceding allegations are incorporated herein.

7.47.  Defendants obtained substantial funds from the Plaintiffs by taking undue advantage.  Nabhan, Sullivan, HLS and other Defendants named herein were unjustly enriched at the expense of Plaintiffs and should be required to disgorge moneys that they obtained based on their inequitable conduct directed toward Plaintiffs herein.

## VIII.

### MALPRACTICE AND BREACH OF FIDUCIARY DUTY

8.1.    All of the preceding allegations are incorporated herein.

8.2.    Defendant Baker Botts was legal counsel to OSC and owed OSC a duty of loyalty and care.  At times, Baker Botts failed to use ordinary care in its representation of OSC.  In particular, Baker Botts failed to use ordinary care in its representation of OSC in connection with the drafting and transmitting of the PPM and Supplemental PPM, OSC's acquisition of HLS, and OSC's issuance of Series B Preferred Stock to the investors.

8.3.    Defendant Baker Botts owed fiduciary duties to OSC, Woodruff and his affiliates, and the Special Committee of OSC.  The facts show that Defendant Baker Botts breached it fiduciary duties to OSC.

8.4.    OSC did not know and could not have known in the exercise of reasonable due diligence the facts and circumstances which give rise to Baker Botts' breach of its duty of care and breach of fiduciary duty the firm owed to OSC.

## IX.

### EXEMPLARY DAMAGES

9.1.    All of the preceding allegations are incorporated herein.

9.2.    Plaintiffs would show that they are entitled to exemplary damages against each defendant pursuant to TEX. CIV. PRAC. & REM. CODE § 41.001, et seq., because of the acts and/or omissions of Defendants Nabhan, Sullivan, HLS, Dow, North, Wasserstein and Baker Botts, by and through their vice-principals, employees, servants, agents, ostensible agents, and/or representatives. In addition to Defendants' liability for exemplary damages for their knowing participation in several violations of fiduciary duties to plaintiffs, they are also subject to TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1) which provides for an award of exemplary damages when a claimant has been damaged by a wrongdoer's fraud.

9.3.    In addition, Plaintiffs would show that the limitation on recovery of exemplary damages contained within TEX. CIV. PRAC. & REM. CODE § 41.008 does not apply herein pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008(c)(9), (commercial bribery); § 41.008(c)(10) (misapplication of fiduciary property); §41.008(c)(11) (securing execution of document by deception); § 41.008(c)(12) (fraudulent concealment of a writing); and § 41.008(c)(13) (theft).

## X.

### JOINT & SEVERAL LIABILITY

10.1.  All of the preceding allegations are incorporated herein.

10.2.  Defendants Nabhan, Sullivan, HLS, North, Wasserstein, Baker Botts, Dow, Giordano, McCarthy, Coffman, and Volkmann are jointly and severally liable to the Plaintiffs pursuant to § 33.01, et seq. of the TEX. CIV. PRAC. & REM. CODE.

## XI.

### DAMAGES

### A.    Woodruff and WFL

11.1.  All of the preceding allegations are incorporated herein.

11.2.  As a direct and proximate result of the Defendants' conduct described above, Woodruff and WFL suffered damages significantly in excess of the initial $2 million "investment" in HLS that who the first known objective transaction leading to this entire course of unlawful conduct by the Defendants.  Plaintiffs' damages include not only that $2 million investment, but millions of dollars Nabhan wrongfully obtained from Woodruff and WFL thereafter by means of deception, misrepresentation, and fraud.

11.3.  Some of the additional consequential damages suffered by Woodruff and WFL in this case include, but are not limited to, the following:

- The monies paid to Nabhan for his "investment advice services," including his salary, bonuses, and stock he received as a result of his relationship with Woodruff and WFL;

- Plaintiffs' loss of the opportunity to recoup some investment losses in OSC by way of sale to Bart Stuck for $2 million;

- The $2 million "loan" Nabhan deceptively required Plaintiffs to make to keep OSC going in 1999;

- The interest and penalties suffered by Woodruff as a result of drawing funds from his IRA to make that loan;

- Another $1.75 million that Nabhan induced Plaintiffs to pay for OSC to conclude the *Laughlin* arbitration in 1999;

- The loss of opportunity to make other profitable investments and use those funds for legitimate purposes;

- Emotional distress and mental anguish damages suffered by Woodruff as a result of Nabhan's and the other Defendants' actions;

- Reasonable attorneys' fees in the trial court, and if necessary, in the court of appeals and the Texas Supreme Court; and

- Exemplary damages.

**B.    The Litigation Trust Beneficiaries**

11.4.  All of the preceding allegations are incorporated herein.

11.5.  As a direct and proximate result of the Defendants' conduct described above, the Litigation Trust beneficiaries suffered the total loss of their investments in OSC Series B Preferred Stock.   The Litigation Trust beneficiaries suffered additional damages, including but not limited to:

- The consideration paid by the Litigation Trust beneficiaries for the Series B Preferred Stock, plus interest from the time of the investment;

- The loss of opportunity to make other investments and use of funds for legitimate represented purposes;

- Reasonable attorneys' fees in the trial court and, if necessary, in the court of appeals and the Texas Supreme Court; and

- Exemplary damages.

**C.    Optical Switch Corporation**

11.6.  All of the preceding allegations are incorporated herein.

11.7. As a direct and proximate result of the Defendants' conduct described above, OSC suffered losses including, but not limited to the value of the $50 million in OSC Series B Preferred Stock paid to HLS as consideration for the asset purchase. In addition to the $50 million loss therein, OSC suffered additional damages of not less than its post-money valuation of $508 million, including but not limited to:

- The consideration paid by OSC for the assets of HLS, minus the actual (negligible) value of assets at the time of acquisition, plus interest;

- Salaries and bonuses paid to Nabhan for his "services" as President, CEO and Chairman of the Board of OSC, which were rendered while he was engaged in violating fiduciary duties to OSC;

- The damages to the convertible debenture holders who were convinced to convert their $6.5 million in debt into a new series of convertible preferred stock, the Series A Convertible Preferred Stock, which resulted in a loss of their priority creditor's rights as debenture holders, falling to parity with the new stock to be issued, the Series B Convertible Preferred Stock;

- The moneys diverted from OSC to fund HLS operations in Bedford, Massachusetts following the asset acquisition;

- The loss of opportunity to make other related investments and use these funds for legitimate purposes;

- The damage to the business enterprise value of OSC caused by the sale of OSC Series B Preferred Stock and acquisition of HLS;

- The Plaintiffs' reasonable attorneys' fees in the trial court, and if necessary, in the court of appeals and the Texas Supreme Court;

- Consideration paid to Baker Botts and Wasserstein for the professional "services" provided, while breaching duties to OSC, in connection with the HLS acquisition; and

- Exemplary damages.

11.8    In summary, the Plaintiffs are entitled to recover:

    a.    Actual damages in an amount in excess of the minimal jurisdictional limits of the Court against the named Defendants;

    b.    Special damages, including, but not limited to, the consequential damages described above;

    c.    Consideration paid for Nabhan's fiduciary and "investment advice services";

    d.    Emotional distress and mental anguish damages suffered by Woodruff as a result of Defendants' actions;

    e.    Exemplary damages;

    f.    Reasonable and necessary attorneys' fees;

    g.    All costs of suit;

    h.    Pre-judgment interest at the highest rate allowed by law from the earliest time allowed by law;

    i.    Interest on the judgment at the highest legal rate from the date of judgment until collected; and

    j.    All such other and further relief at law or in equity to which Plaintiffs may show they are justly entitled to.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that Defendants be cited to appear herein, and that upon a final hearing of the cause, judgment be entered for Plaintiffs against Defendants for damages in an amount within the jurisdictional limits of this Court, exemplary damages as allowed by the common law and § 41.008 of the TEX. CIV. PRAC. & REM. CODE, together with pre-judgment interest (from the date of injury through the date of judgment) at the maximum rate allowed by law, post-judgment interest at the legal rate, costs of court, and such other and further

relief to which plaintiff may be entitled to at law or in equity.

Respectfully submitted,

**BOYD & ASSOCIATES**

**/s/ Samuel L. Boyd**
**Samuel L. Boyd, P.C.**
State Bar Card No. 02777500
**Kirk A. Kennedy**
State Bar Card No. 00794080
600 University Tower, L.B. 48
6440 N. Central Expressway
Dallas, Texas 75206
Telephone: (214) 696-2300
Facsimile:  (214) 363-6856

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

This will certify that a true and correct copy of the foregoing instrument has been served via electronic mail or regular mail upon counsel for Defendants on this the 17th day of May 2005, according to the Texas Rules of Civil Procedure, as follows:

**COUNSEL FOR GARY NABHAN**
Charles "Chip" Babcock
Ryan Wirtz
Jackson Walker
901 Main Street, Ste. 6000
Dallas, TX 75202
214-953-6000
214-953-5822 (fax)
214-953-6071 (Ryan Wirtz direct)
rwirtz@jw.com

**COUNSEL FOR SULLIVAN**
Timothy A. Daniels
Figari & Davenport, L.L.P.
901 Main Street, Suite 3400
Dallas, Texas 75202
214-939-2000
214-939-2090 (fax)
214-939-2016 (Tim Daniels direct)
tdaniels@figdav.com

**COUNSEL FOR BAKER BOTTS L.L.P.**
George W. Bramblett, Jr.
Todd B. Baker, Esq.
Haynes and Boone, LLP
901 Main Street
Suite 3100
Dallas, TX 75202-3789
(214) 651-5000
(214) 651-5940 fax

**ATTORNEYS FOR BARRY COFFMAN, ROBERT GIORDANO AND WILL VOLKMANN**
Stephen Wilson, Esq.
Locke, Liddell & Sapp LLP
2200 Ross Avenue
Suite 2200
Dallas, TX 75201-6776
(214) 740-8000
(214) 740-8800 fax

**ATTORNEYS FOR WILLIAM MCCARTHY**
Jeffrey M. Tillotson, Esq.
John Volney, Esq.
Lynn, Tillotson & Pinker, LLP
750 North St. Paul
Suite 1400
Dallas, TX 75201
(214) 981-3800
(214) 981-3839 fax

**ATTORNEYS FOR CYNTHIA DOW**
Stephen Malouf, Esq.
Law Offices of Stephen Malouf
3506 Cedar Springs Road
Dallas, TX 75219
(214) 969-7373
(214) 969-7648 fax

**Co-Counsel FOR CYNTHIA DOW**
Cheryl Turner, Esq.
Stephen Malouf Law Offices
3506 Cedar Springs Road
Dallas, TX 75219
(214) 969-7373
(214) 969-7648 fax

**ATTORNEYS FOR WASSERSTEIN, PERELLA, INC. AND KERRY NORTH**
John H. McDowell, Jr.
Hughes & Luce, L.L.P.
1717 Main Street, Suite 2800
Dallas, TX 75201
214-939-5500
214-939-6100 fax


/s/ Samuel L. Boyd
**Samuel L. Boyd, P.C.**