UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIEL J. SULLIVAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 05-CV-10310-MLW |
| WILLIAM K. WOODRUFF, III, | ) | [ORAL ARGUMENT REQUESTED] |
| WOODRUFF FAMILY, LTD. and | ) | |
| OPTICAL SWITCH CORPORATION | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF DANIEL J. SULLIVAN'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

This memorandum of law is being submitted on behalf of Plaintiff Daniel J. Sullivan

("Sullivan") in opposition to the motion to dismiss filed on behalf of Defendants Optical Switch

Corporation ("OSC"), William K. Woodruff, III ("Woodruff") and Woodruff Family Limited

("WFL") (hereinafter jointly referred to as "Defendants"). The only grounds asserted by

Defendants for their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is that this Court has

neither subject matter jurisdiction over this action nor personal jurisdiction over Defendants.

Defendants, however, have provided this Court with no affidavits or other materials on which to

base their personal jurisdiction argument.

As set forth in his complaint, Sullivan seeks a declaration that he is not liable for any

damages allegedly suffered by any of the Defendants in connection with the 1998 investment in

Holographic Lithography Systems, Inc. ("HLS") by WFL or Woodruff, OSC's raising of capital

through a private placement memorandum (the "PPM") or OSC's 2000 acquisition of HLS.

Although Defendants assert that this Court has neither subject matter jurisdiction over this matter

nor personal jurisdiction over Defendants, Defendants fail to advise the Court that (1)

representatives of OSC made numerous visits to the Commonwealth of Massachusetts in

9692267_2.DOC

connection with its purchase of HLS, a Massachusetts-based company, (2) after the purchase of HLS, OSC maintained a facility and operated its business in Bedford, Massachusetts, (3) representatives of WFL and Woodruff made numerous visits to the Commonwealth of Massachusetts in connection with their investment in HLS, (4) Woodruff communicated with Sullivan, in Massachusetts, concerning his investment in HLS and repeatedly visited the Commonwealth of Massachusetts after OSC's purchase of HLS; and (5) OSC solicited investments and raised at least $35 million in Massachusetts through its PPM. Here, instead of acknowledging their many contacts with the Commonwealth of Massachusetts and filing an answer to Sullivan's Complaint, Defendants filed a motion to dismiss without the requisite supporting facts or legal argument.

Defendants also fail to advise this Court in their motion to dismiss that it was they who removed this action to this Court from Norfolk Superior Court and in doing so represented to this Court that it had subject matter jurisdiction. Now Defendants move to dismiss arguing, contrary to their own representations to this Court, that there is no subject matter jurisdiction in this Court. If that were the case, this Court should remand to Norfolk Superior Court, not dismiss the action. The facts, however, are that there is complete diversity of citizenship and more than $75,000, exclusive of interest, in dispute. To the extent Defendants rely on the fact Sullivan based his state court action for declaratory judgment on Mass. R. Civ. P. 57 and G.L. c. 231A, once this matter was removed to this Court obviously Sullivan's claims are to be governed by the procedural rules of this Court, Fed. R. Civ. P. 57 and 28 U.S.C. §2201. To the extent Defendants suggest otherwise, they are wrong.

Defendants also assert that Sullivan is engaged in "blatant forum shopping" although they concede, as they must, that Sullivan filed his complaint before he was added as a defendant to the Texas action referenced in Defendants' motion. Further, although Defendants claim that Sullivan has been "active" in the Texas lawsuit, they fail to disclose that his activity has been limited to contesting personal jurisdiction. Here, because Defendants have not shown that

litigating this matter in Massachusetts would be oppressive, venue is proper and the Court should exercise jurisdiction over this action and over Defendants.[1]

## FACTS

### I.    Parties

Sullivan, a Massachusetts resident, was President, Chief Executive Officer, and a member of the Board of Directors of HLS, which was incorporated in the state of Delaware and had its principal and only place of business in Bedford, Massachusetts. Sullivan Affidavit, ¶5. HLS was incorporated, in or about 1996, to develop a proprietary, patented lithography tool and process capable of high resolution patterning. *Id.*

Woodruff is a resident of Texas and WFL is a limited liability partnership in Texas which controls Woodruff's personal and family investments. Complaint, ¶¶3-4. Woodruff was the majority shareholder of OSC, which is a Texas corporation that specializes in the design and manufacture of transparent optical switch modules and subsystems for telecommunications customers. *Id.*, ¶19.

---

[1] The cases cited by Defendants in support of their motion are inapposite. Importantly, none of the cases cited by Defendants involved two proceedings that both commenced in state courts and none involved the situation present here -- namely that Sullivan filed his action first and is not subject to personal jurisdiction in the State of Texas. For example, in *National Railroad Passenger Corp. v. Providence and Worcester Railroad Corp.*, 798 F.2d 8, 12 (1st Cir. 1986), unlike here, the state court action was filed before the action in the federal district court. *See id.* ("Jurisdiction was first obtained in the Rhode Island courts. The Rhode Island court first assumed (and retains) jurisdiction over the condemnation award."). Similarly, in *Employers Ins. of Wausau v. Unisys Corp.*, 103 F.3d 129 (6th Cir. 1996), the New Jersey state court action was filed before declaratory judgment action in federal court. Further, in *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 495-498 (1942), the Supreme Court held that the case should be remanded back to the district court to properly determine whether it should exercise its jurisdiction, a holding which does not support Defendants' argument. Accordingly, it would be improper to dismiss Sullivan's declaratory judgment action, which was filed in Norfolk Superior Court two weeks before defendants filed the Texas Action against Sullivan.

## II.    Woodruff's, WFL's, and OSC's Contacts with Massachusetts

### A.    WFL's Investment in HLS

In late May or early June 1998, Sullivan communicated from Massachusetts with Gary Nabhan ("Nabhan"), a personal friend, about HLS. Nabhan was employed by William K. Woodruff & Co., Inc. an investment banking firm run by Woodruff. Sullivan Aff., ¶7. During this conversation, Nabhan and Sullivan discussed HLS' technology and its business plan. *Id.* Subsequently, Sullivan, from Massachusetts, spoke with Nabhan and Woodruff about Woodruff making a potential $2 million investment in HLS. *Id,* ¶8. On June 12, 1998, Nabhan, on behalf of Woodruff, sent a letter addressed to Sullivan into Massachusetts confirming Woodruff's contemplated investment in HLS. *Id.,* ¶11, Exhibit 1. Specifically, Nabhan, on behalf of Woodruff, advised that "[s]ubject to completion by [Woodruff] of business and intellectual property due diligence regarding HLS . . . [Wooodruff] will invest a total of $2 million (US) into HLS . . ." *Id.*

Two months later, on August 25, 1998, Woodruff provided Nabhan with power of attorney concerning the HLS investment. *Id.,* ¶13, Exhibit 2. Pursuant to this Power of Attorney, Woodruff -- as general partner of WFL -- appointed Nabhan "to act in my name, place and stead and on my behalf to take all actions and do all other things on behalf of the Partnership in connection with the purchase by the Partnership for Two Million Dollars of Series C Preferred Stock of Holographic Lithography Systems, Inc...." *Id.*

During 1998, due diligence was performed in Massachusetts on behalf of Woodruff and WFL concerning the contemplated investment in HLS. *Id.,* ¶12. Specifically, on numerous occasions in 1998, representatives of Woodruff and WFL, including Nabhan, visited HLS' facilities in Bedford, Massachusetts and questioned Sullivan and HLS' technical staff at length concerning HLS' operations and technology. *Id.* Representatives of Woodruff and WFL, including Nabhan, also reviewed, in Bedford, Massachusetts, HLS' financial information and board minutes. *Id.* Woodruff and WFL also retained Bart Showalter ("Showalter"), of Baker Botts LLP, to perform intellectual property due diligence for the proposed investment in HLS.

*Id.* Showalter examined, in Bedford, Massachusetts, HLS' patents and reviewed documents concerning financing that HLS had previously obtained. *Id.* In addition, WFL and Woodruff sent Bart Stuck, an expert in electro-optics, to HLS in Bedford, Massachusetts to examine HLS' technology. *Id.* On or about August 31, 1998, WFL, through Woodruff and Nabhan, agreed to invest $2,000,000 million in HLS. *Id.*, ¶14. WFL invested $1,000,000 on or about August 31, 1998 and another $1,000,000 on or about December 31, 1998. *Id.*

After the initial million dollar investment in the Massachusetts based company which sum was wired to the HLS bank account in Massachusetts, Woodruff spoke via telephone with Sullivan in Massachusetts to discuss WFL's investment in HLS. *Id.*, ¶15. Specifically, Woodruff spoke with Sullivan about re-negotiating the purchase price for the Series C preferred shares to approximately $74 per share, about $20 less per share than originally agreed, which Sullivan and HLS agreed to do. *Id.*, ¶15. After this agreement, WFL then funded the second portion of the stock purchase on or about December 31, 1998 by wire transferring funds to HLS' bank account in Massachusetts. *Id.*, ¶16.

**B. Private Placement Memorandum ("PPM")**

In the fall of 1999, Woodruff solicited Sullivan in Massachusetts to invest in OSC, of which Woodruff was the majority shareholder. *Id.*, ¶18. As a result, Sullivan invested $200,000 in OSC. *Id.* In or around December 1999, at the request of Woodruff and Nabhan, Sullivan agreed to serve on OSC's Board of Directors. *Id.* Sullivan, however, never had any involvement in the day-to-day operations of OSC. *Id.*

In the fall of 1999, before Sullivan joined OSC's Board of Directors, OSC began the process of creating a Private Placement Memorandum ("PPM") in order to raise additional capital. *Id.*, ¶19. OSC retained a Massachusetts consultant Larry Griffin, to work on the PPM. *Id.*

The PPM issued on December 24, 1999, and succeeded in raising approximately $58 million. *Id.*, ¶20. Of that amount, more than $35 million, or approximately 60%, was raised from individuals and entities based in Massachusetts. *Id.* Putnam Investments, headquartered in

Massachusetts, invested $20 million. Wellington Management, also located in Massachusetts, invested $10 million. The Tudor Fund that invested $5 million is managed out of Boston, Massachusetts. In addition, individual investors in HLS – Will Volkmann, Barry Coffman, and Daniel Sullivan, each a Massachusetts resident -- also invested in OSC pursuant to the PPM, as did Bracebridge Young, another Massachusetts resident. *Id.* Sullivan never traveled to Texas in connection with the PPM. *Id.*

### C.     OSC's Acquisition of HLS

Also in the fall of 1999, representatives of OSC first inquired about the possibility of using the HLS lithography technology in the manufacture of its optical switch products, but the nature of the relationship or even whether a business relationship would exist between OSC and HLS had not yet been determined. At the January, 2000 HLS Shareholders' meeting, OSC, through Nabhan, first expressed an interest in exploring the possibility of acquiring HLS. This interest of OSC was reflected in the Supplemental PPM issued on March 24, 2000. *Id.*, ¶21.

The acquisition of HLS by OSC, however, was a matter of great concern to the HLS employees who very much had been involved in the development of the technology at HLS and who strongly believed that HLS was viable as an independent company. OSC, on the other hand, had expressed to Sullivan through Nabhan and Woodruff that OSC wanted to control who had access to HLS' technology and for that reason an acquisition of HLS represented a strategic business decision for OSC. *Id.*, ¶ 22. Ultimately, the shareholders of HLS agreed to the sale, and OSC acquired the assets of HLS for shares in OSC. *Id.*

In May 2000, HLS and OSC entered into an Asset Purchase Agreement, pursuant to in which OSC acquired the assets of HLS, all of which were in Massachusetts. Sullivan Aff., ¶27; Nole Aff., ¶8. After this acquisition, HLS no longer was an operating company, and the business of HLS was then conducted as the Microphotonics Group of OSC in Massachusetts. Sullivan

Aff., ¶28; Nole Aff., ¶9. After the acquisition, Sullivan had no further involvement with the day-to-day operations of HLS, and he never had any involvement with the day-to-day operations of OSC. In fact, Sullivan made no trips to Texas in connection with Defendants until after the three (3) transactions had been completed. Sullivan Aff., ¶28. In December 2001, Woodruff took over operations at OSC and became Chairman, President, and Chief Executive Officer and removed Sullivan from the Board of Directors. *Id.*, ¶30.

After the acquisition, OSC maintained an office in Bedford, Massachusetts and conducted its main business in Massachusetts. *Id.*, ¶29. OSC was registered to do business in Massachusetts. *Id.* The Bedford facility grew from 7 employees to over 40. Nole Aff., ¶9. Further, between January and April 2002 Woodruff traveled to Massachusetts to meet with OSC's employees in Bedford, MA at least monthly and often every other week. *Id*, ¶13.

## IV.    Procedural Background

On January 31, 2005, Sullivan filed the instant action in Norfolk Superior Court for the Commonwealth of Massachusetts (the "Massachusetts Action"), and Defendants subsequently removed the Massachusetts Action to this Court. Sullivan Aff., ¶2. On February 10, 2005, Sullivan was added as a defendant in an action that previously had been filed by WFL in Texas County Court against only Nabhan and HLS (the "Texas Action")..[2] After being served with the

---

[2] While the defendants accuse Sullivan of "blatant forum shopping," they have neglected to disclose that they themselves engaged in what can only be described as the most abusive and offensive kind of forum shopping. Specifically, after WFL filed the Texas Action on November 12, 2004 in the Texas "County" Court against only HLS and Nabhan, less than one week later, on November 18, 2004, OSC filed suit in the "District Court" of Dallas County Texas, a state court of virtually identical jurisdiction against HLS, Nabhan and Sullivan. Sullivan immediately filed a Special Appearance contesting the Texas court's personal jurisdiction over him, and set a hearing on the matter. Defendants' counsel proceeded to nonsuit Sullivan in the District Court litigation two business days before the scheduled hearing, and dismissed the case entirely shortly thereafter. According to Texas law, once an

(footnote continued to next page)

Texas Action, Sullivan filed a special appearance by which he is contesting personal jurisdiction in Texas.

In the Massachusetts Action, Sullivan seeks a declaration that he is not liable for any damages allegedly suffered by any of Defendants OSC, WFL or Woodruff in connection with the 1998 investment in HLS by WFL/Woodruff, OSC's raising of capital through the PPM, or OSC's 2000 acquisition of HLS.[3] All of these transactions occurred primarily and substantially in the Commonwealth of Massachusetts. Sullivan Aff., ¶3. Specifically, WFL and Woodruff (and their representatives) performed due diligence in Massachusetts and decided to invest $2 million in HLS, a Massachusetts-based company. Id., ¶11-17. OSC raised over $35 million from individuals and organizations based in Massachusetts through its PPM. Id., ¶ 18-20. Further, OSC performed due diligence in Massachusetts, acquired HLS, and continued to operate the Bedford, MA facility after the acquisition. Id., ¶21-31. In connection with these transactions, Sullivan performed his duties as President and director of HLS -- including all

---

(footnote continued from previous page)

action has been non-suited, it is as though that action never occurred. See, e.g., Alvarado v. Hyundai Motor Co., 885 S.W.2d 167, 174 (Tex. App.--San Antonio 1994, writ granted) ("The nonsuit or dismissal is not an adjudication of the rights of the parties but merely places them in the position they were in as if suit had never been filed."), rev'd on other grounds, 892 S.W.2d 853 (citing Crofts v. Court of Civil Appeals, 362 S.W.2d 101, 103 (Tex. 1962) ("just as if the suit had never been brought.")). "Moreover, once the case is dismissed voluntarily, no further action may be had in that case, and any further action must be taken by instituting a suit de novo unless the trial court grants a motion to reinstate." See id. (citing Crofts and Ashpole v. Millard, 778 S.W.2d 169, 171 (Tex. App.--Houston [1st Dist.] 1989, orig. proceeding)).

[3] Defendants claim, without support, that this action "will require this Court to adjudicate issues based on Texas state law." Motion, p. 4. Indeed, even a cursory read of Sullivan's complaint reveals that none of the claims asserted by Sullivan are based on Texas law. In any event, "a federal court in either jurisdiction is equally capable of applying appropriate state or federal law." Holmes Group, Inc., 249 F. Supp. 2d at 18. See also Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 720-21 (1st Cir. 1996) (fact that Massachusetts court would have to apply Hong Kong law "not sufficient to overcome the presumption in favor of plaintiffs' chosen forum").

negotiations -- from Massachusetts and his contacts with Defendants occurred primarily and substantially in Massachusetts. *Id., passim.*

## ARGUMENT

### I.    Standard of Review

Where the proponent of a motion to dismiss pursuant to Rule 12(b)(2) does not seek an evidentiary hearing, the plaintiff must only establish a prima facie showing of personal jurisdiction. *See United Elec. Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 987 F.2d 39, 43-44 (1st Cir. 1993). To make that showing, plaintiff must come forward with affirmative proof that the defendant is subject to personal jurisdiction. *Id.* at 44. In weighing that proof, the district court should accept a plaintiff's properly supported proffers of evidence as true, unless those proffers are palpably incredible, or the record is "rife" with contradictions, or the plaintiff's evidence is self-contradicting. *See id*; *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145-46 (1st Cir. 1995).

Courts engage in a two part analysis to determine whether personal jurisdiction is appropriate. First, the exercise of personal jurisdiction must be sanctioned by the provisions of the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, and second, jurisdiction must comport with the due process requirements of the United States Constitution. *See Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 39 (D. Mass. 1997).

### II.    The Massachusetts Long Arm Statute Reaches Defendants' Conduct

#### A.    Jurisdiction is proper under § 3(a) as Defendants have transacted business in the Commonwealth of Massachusetts.

Mass. Gen. Laws ch. 223A § 3(a) provides that a court may exercise personal jurisdiction over a defendant where the action arises from the person's or his agents' "transacting any business in this commonwealth." Massachusetts courts have construed this provision of the long-arm statute broadly. *See Hahn v. Vt. Law Sch.*, 698 F.2d 48, 50 (1st Cir. 1983) ("language 'transacting any business' should be construed broadly"); *Bond Leather Co. v. Q.T. Shoe Mfg.*

*Co.*, 764 F.2d 928, 931 (1st Cir. 1985); *Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 56 F.

Supp. 2d 134, 138 (D. Mass. 1999); *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767 (1994).

"The defendant need not have a physical presence in Massachusetts. The test focuses

instead upon whether the defendant attempted to participate in the commonwealth's economic

life." *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1087 (1st

Cir. 1992) (citations omitted). *See also Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d

138, 144 (1st Cir. 1995) ("Its [M.G.L. ch. 223A, §3(a)] language is expansive, and its words are

to be generously applied in order to determine whether a given defendant fairly can be said to

have participated in the forum's economic life."). Given this broad construction, there is no

doubt that the long-arm statute reaches all of the Defendants. Specifically, the following facts

demonstrate that all of the Defendants have attempted to participate in the economic life of the

Commonwealth of Massachusetts:

- Nabhan, on behalf of Woodruff, contacted Sullivan and advised that Woodruff was interested in making an investment in HLS, a company located in Bedford, Massachusetts.

- Nabhan, on behalf of Woodruff, sent a letter to Massachusetts addressed to Sullivan confirming Woodruff's contemplated investment in HLS.

- Nabhan acted as Woodruff's power of attorney in connection with the HLS investment.

- Nabhan, on behalf of Woodruff and WFL, performed due diligence in Massachusetts concerning the contemplated investment in HLS.

- Nabhan and other representatives of Woodruff and WFL visited HLS' facilities in Bedford, Massachusetts and questioned Sullivan and HLS' technical staff at length concerning HLS' operations and technology.

- Representatives of Woodruff and WFL, including Nabhan, reviewed, in Bedford, Massachusetts, HLS' financial information and board minutes.

- On or about August 31, 1998, HLS agreed to sell WFL $2,000,000 worth of HLS Series C Preferred Shares to WFL.

- Prior to the August 1998 closing, Woodruff spoke via telephone with Sullivan in Massachusetts to discuss this proposed investment in HLS.

- Nabhan, as attorney-in-fact for Woodruff, executed the closing documents on behalf of Woodruff and WFL.

- After the closing, Woodruff again spoke via telephone with Sullivan in Massachusetts to discuss the investment in HLS. Specifically, Woodruff initiated a call with Sullivan to re-negotiate the purchase price for the Series C preferred shares, which Sullivan and HLS agreed to do.

- OSC raised more than $35 million from people and entities based in Massachusetts in connection with the PPM.

- In 2000, representatives of OSC visited HLS in Bedford, Massachusetts on numerous occasions and met with Sullivan at his offices in Bedford.

- During these visits, HLS produced samples of its capabilities for OSC to analyze, and Sullivan met personally with Robert Gardner, OSC's Chief Technical Officer, and Gary Nabhan, OSC's Chief Executive Officer, in Bedford, MA to discuss HLS' and OSC's technology.

- Sullivan had numerous communications in Massachusetts with representatives of OSC, including Nabhan, concerning the proposed acquisition.

- In May 2000, HLS and OSC entered into an Asset Purchase Agreement, in which OSC acquired the assets of HLS.

- After the HLS acquisition, Woodruff regularly visited the Bedford, Massachusetts facility.

- After the HLS acquisition, OSC was registered to do business in Massachusetts and operated what had been HLS in Bedford, Massachusetts, increasing the number of employees from 7 to more than 40.

Based on Defendants' numerous, extensive, intentional and substantive contacts with the Commonwealth, Defendants have purposefully availed themselves of business opportunities in Massachusetts, and jurisdiction is therefore appropriate. Indeed, Massachusetts courts consistently have held that contacts with Massachusetts far less substantial than those of Defendants meet the requirements of transacting business in the Commonwealth. *See Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 983-984 (1st Cir. 1986) (cause of action arising out of a single telex is not barred by jurisdictional requirements); *Bond Leather Co. v. Q.T. Shoe Mfg. Co.*, 764 F.2d 928, 932-933 (1st Cir. 1985) (jurisdictional requirement satisfied where defendant sent *four letters* into Massachusetts and had received one telephone call from the Commonwealth) (emphasis added); *Good Hope Indus., Inc. v. Ryder Scott Co.*, 378 Mass. 1, 6 (1979) (repeated telephone calls to the Massachusetts-based plaintiff, as well as its mailing of periodic reports and billing documents to Massachusetts, constituted purposeful engagement

with the Massachusetts plaintiff sufficient to confer jurisdiction); *Johnson v. Witkowski*, 30
Mass. App. Ct. 697, 713 (Mass. App. Ct. 1991) (signing of document was purposeful and
meaningful business transaction creating an ongoing fiduciary relationship which constituted
"transacting business" for jurisdictional purposes). Further, Massachusetts courts repeatedly
have confirmed that even "[a] single act within the Commonwealth may be sufficient" to confer
jurisdiction over the defendants. *Sonnabend v. Sorrentino*, 866 F. Supp. 651, 653 (D. Mass.
1994) (emphasis added). *See also Morrill v. Tong*, 390 Mass. 120, 132 (1983) ("a single act
within the forum may, in a proper circumstance, be sufficient to warrant the assertion of
jurisdiction over a defendant"); *Carlson Corp. v. Univ. of Vt.*, 380 Mass. 102, 105 (single visit to
Massachusetts to sign a contract sufficient for jurisdictional purposes).

Given that Sullivan can point to a variety of contacts, jurisdiction over the Defendants is
clearly appropriate. Further, the Massachusetts Long-Arm Statute is satisfied inasmuch as there
is no dispute that Sullivan's complaint for declaratory judgment arose from Defendants' actions
in Massachusetts. Specifically, the transactions related to Sullivan's complaint for a declaratory
judgment -- (i) WFL's and Woodruff's decision to invest in HLS, a Massachusetts based
company, (ii) OSC's raising of more than $35 million from people and entities based in
Massachusetts through its PPM, and (iii) OSC's decision to acquire HLS -- all arose from
Defendants' actions in Massachusetts. *See Micro Networks Corp. v. HIG Hightec, Inc.*, 195 F.
Supp. 2d 255, 262 (D. Mass. 2001) ("activities undertaken by Hightec in Massachusetts [as an
equity investor and later as a member of Micro Network's Board of Directors] certainly are
connected to the instant dispute").

### III.    The Exercise of Jurisdiction Over the Defendants Comports With Due Process

To establish personal jurisdiction over Defendants in a manner consistent with
Constitutional due process, Defendants must have "minimum contacts with the forum state so
that the exercise of jurisdiction does not offend traditional notions of fair play and substantial
justice." *N. Light Tech., Inc. v. N. Lights Club*, 97 F. Supp. 2d 96, 106 (D. Mass. 2000), *aff'd*,
236 F.3d 57 (1st Cir. 2001) (internal quotations and citations omitted). To determine whether

Defendants have sufficient "minimum contacts" with the Commonwealth, Massachusetts courts engage in a three part inquiry:  (1) the claim underlying the litigation must be related to the defendant's Massachusetts activities; (2) the defendant must have minimum contacts with the forum state that demonstrate a purposeful availment of the privilege of conducting activities in the forum state; and (3) the exercise of jurisdiction must be reasonable. *See Pritzker v. Yari*, 42 F.3d 53, 60-61 (1st Cir. 1994), *cert. denied*, 514 U.S. 1108 (1995). Although Defendants' motion papers do not even attempt to analyze the factors Massachusetts courts consider in determining whether jurisdiction over a defendant comports with due process, an analysis of their contacts with Massachusetts establishes that the exercise of jurisdiction over them is proper under each of the Due Process tests.

A.     **Sullivan's Complaint for Declaratory Judgment Against Defendants Arises Directly From Their Contacts With Massachusetts.**

The analysis of the relatedness element concerns "the nexus between the plaintiff's claims and the defendant's contacts with the forum." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995).  The relatedness standard is both "flexible" and "relaxed." *See Pritzker*, 42 F.3d at 61.  Courts "consider whether plaintiffs' cause of action can 'conceivably be said to have arisen directly from, or been caused proximately by,' defendants contacts with the forum." *Bennett v. Jack Dennis Whitewater Trips*, 925 F. Supp. 889, 896 (D. Mass. 1996) (quoting *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1089 (1st Cir. 1992)). *See NUCOR Corp. v. Aceros Y. Maquilas de Occidente, S.A.*, 27 F.3d 572, 577-82 (7th Cir. 1994) (Personal jurisdiction over Texas company found in declaratory judgment action under Indiana Long Arm Statute.)

Here, Sullivan's complaint for declaratory judgment arose from (i) WFL's and Woodruff's decision to invest in HLS -- a Massachusetts-based company, (ii) OCS's raising of more than $35 million from people and entities based Massachusetts through its PPM, and (iii) OSC's decision to acquire HLS.  Further, there is no dispute, that in connection with these transactions, Sullivan performed his duties as President and director of HLS -- including all

negotiations -- from Massachusetts and his contacts with Defendants occurred primarily and substantially in Massachusetts.  Indeed, it is not disputed, and is in fact irrefutable, that the contacts at issue in this case between Defendants, on the one hand, and, Sullivan, on the other hand, concerned the due diligence, negotiations and transactions that occurred substantially and primarily in the Commonwealth of Massachusetts. *See Micro Networks Corp.*, 195 F. Supp. 2d at 262-63 ("Micro Networks' claims arise from Hightec's conduct as a purchaser of preferred stock and then an equity stockholder in a Massachusetts-based business, all pursuant to a written contract."); *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC.*, 246 F. Supp. 2d 102, 113 (D. Mass. 2003) ("MGM's four telephone calls, five emails, and three faxes to WTC in Massachusetts for the purpose of negotiating the terms of the contract were unquestionably jurisdictional contacts for purpose of the constitutional analysis.").

Given the magnitude of Defendants' contacts with Massachusetts and their relation to Sullivan's complaint for declaratory judgment, Sullivan's claims against Defendants can "conceivably be said to have arisen directly from, or been caused proximately by" Defendants' contacts with the Commonwealth of Massachusetts. *See United Elec., Radio & Mach. Workers*, 960 F.2d at 1089.  This is particularly so in light of the "flexible" and "relaxed" standards applied by Massachusetts courts in evaluating the "relatedness" of defendants' Massachusetts contacts with the claims against the defendants. *See Pritzker*, 42 F.3d at 61.

**B.    Defendants Have Sufficiently and Purposefully Availed Themselves of the Forum to Make the Exercise of Jurisdiction Proper.**

The analysis of the purposeful availment requirement of the minimum contacts standard focuses upon the character of the defendants' contacts with the forum state.  The contacts must be voluntary and deliberate and must reasonably alert the defendants to the prospect that they could be "haled into court in the forum state." *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 468 (D. Mass. 1997) (internal quotations and citation omitted).

Here, representatives of WFL and OSC conducted due diligence and negotiations in Massachusetts, conducted business over the telephone with Sullivan (who was located in

Massachusetts), and sent correspondence into the Commonwealth to Sullivan, all of which related to Woodruff's and WFL's investment in HLS and OSC's acquisition of HLS. Woodruff not only conducted business on the telephone with Sullivan in Massachusetts but also appointed Nabhan -- who had numerous contacts with Sullivan in Massachusetts -- to act on his behalf concerning Woodruff's investment in HLS. These activities were all purposefully directed towards Massachusetts and were directly related to the claims asserted by Sullivan. In addition, OSC raised more than $35 million from investors in Massachusetts. Further, after OSC's acquisition of HLS, OSC registered to do business in Massachusetts and operated a facility in Bedford, Massachusetts, making it the principal OSC operation. In addition, Woodruff made several trips to this facility, providing additional support that jurisdiction is proper. *See Workgroup Tech. Corp.*, 246 F. Supp. 2d at 114 ("MGM's other contacts with Massachusetts revealed an even more substantial attempt by MGM purposefully to avail itself of the privilege of conducting business activities in the state.").

Defendants' contacts with Massachusetts were neither random nor isolated; rather, Defendants purposefully availed themselves of the privilege of conducting extensive and substantial activities in the Commonwealth.[4] *See Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc.*, 56 F. Supp. 2d 134, 139 (D. Mass 1999) (purposeful availment established based on "multiple telephone calls, faxes, and letters"); *Workgroup Tech. Corp.*, 246 F. Supp. 2d at 114 ("exercising personal jurisdiction is appropriate because MGM purposefully derived economic benefits from its forum-state activities").

### C.    The "Gestalt Factors" Favor Resolving the Matter in This Forum.

---

[4] Woodruff and WFL invested $2,000,000 in HLS; OSC, of which Woodruff was principal shareholder, raised over $35,000,000 through the PPM from investors in Massachusetts; and OSC then acquired and operated the entire HLS operation in Massachusetts. These were not small, isolated or minimal transactions. Activities measured well in excess of $37,000,000 certainly establish minimum contacts for jurisdictional purposes.

The final consideration relating to the minimum contacts analysis is whether the exercise of jurisdiction is reasonable. "In assessing reasonableness, the Court has directed focus on five gestalt factors: (1) the defendant's burden in appearing in court; (2) the forum state's interest in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all interested states in promoting substantive social policies." *Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 45 (D. Mass. 1997) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). A review of the gestalt factors indicates that the exercise of jurisdiction by this Court is reasonable.

With regard to inconvenience, the First Circuit has noted that "it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction" and thus the defendant must demonstrate that "'exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way.'" *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 718 (1st Cir. 1996) (quoting *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994)). Here, Defendants have not even alleged that the exercise of jurisdiction would be special, onerous or unusual, presumably because they realize jurisdiction is proper. Indeed, Defendants found Massachusetts convenient enough to operate OSC in Bedford, Massachusetts and to raise over $35,000,000 in Massachusetts pursuant to the PPM; they should not be allowed to argue Massachusetts is now inconvenient. Accordingly, this factor favors asserting personal jurisdiction over the defendants.

The second gestalt factor, the forum state's interest in hearing the suit, also weighs in favor of keeping this lawsuit in Massachusetts. Sullivan is a Massachusetts resident and seeks a declaration that his actions, which were performed in Massachusetts, were lawful. *See, e.g., Micro Networks Corp. v. HIG Hightec, Inc.*, 195 F. Supp. 2d 255, 263 (D. Mass. 2001) ("Massachusetts has an interest in exercising jurisdiction over a suit involving the corporate governance of a Massachusetts-based company, particularly where significant events leading to the present dispute occurred in Massachusetts."); *Yankee Group v. Yamashita*, 678 F. Supp. 20,

-16-

23 (D. Mass. 1988) ("Massachusetts has an interest in protecting its residents from tortious conduct on the part of non-resident corporate officers"). Moreover, there is an overwhelming Massachusetts flavor to the three (3) transactions in dispute.

The third gestalt factor, convenience to the plaintiff, clearly weighs in favor of Sullivan. Sullivan works and resides in Massachusetts and chose this forum to present his case. Most of his witnesses reside in Massachusetts, as do his attorneys. The First Circuit "has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference." *Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995).

The fourth gestalt factor, the judicial system's interest in obtaining the most effective resolution of the controversy, is usually a wash. *Digital Equip. Corp. v. AltaVista Tech., Inc.*, 960 F. Supp. 456, 471 (D. Mass 1997). Here, there is no support for the argument that Texas has a greater interest than Massachusetts in the resolution of this case. Moreover, there are numerous justifications that can be advanced for hearing the case in a Massachusetts forum, including that Sullivan is a Massachusetts resident, that the relevant operations of both OSC and HLS were in Massachusetts, that over 60% of the investment in OSC -- $35,000,000 – was raised through the PPM from Massachusetts residents, that the financial transactions were effected in Massachusetts, that the key events underlying the transactions occurred in Massachusetts (the due diligence) and that most of the knowledgeable witnesses – former HLS employees – reside in Massachusetts. Furthermore, there is local interest in adjudicating the alleged liability of a former Massachusetts shareholder and member of the board of directors of HLS, a Massachusetts-based company.

The fifth and final gestalt factor is to examine the social policies advanced by the exercise of jurisdiction, which is probably not relevant to this case. In sum, the gestalt factors are either neutral or favor Sullivan. Because Sullivan has provided sufficient evidence that jurisdiction over the Defendants complies with due process, Defendants' motion to dismiss for lack of personal jurisdiction should be denied.

## CONCLUSION

Accordingly, and for the foregoing reasons, Plaintiff Daniel J. Sullivan respectfully requests that this Court deny Defendants' motion to dismiss and enter an order exercising subject matter jurisdiction over this action, exercising personal jurisdiction over Defendants and granting Sullivan such other and further relief as is just and proper.

Dated: Boston, MA
      July 1, 2005

Respectfully submitted,

DECHERT LLP

By: _____
     Bernard J. Bonn III (BBO#049140)
     Matthew M. Lyons (BBO# 657685)
     200 Clarendon Street, 27th Floor
     Boston, MA 02116
     (617) 728-7100

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party on July 1, 2005.

_____
Bernard J. Bonn, III