UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DANIEL J. SULLIVAN )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WILLIAM K. WOODRUFF, III, )<br>WOODRUFF FAMILY, LTD. and )<br>OPTICAL SWITCH CORPORATION )<br>Defendants. )<br>) | Civil Action No.<br>05-CV-10310-MLW |

Commonwealth of Massachusetts    )
                                 ) ss.
County of Middlesex              )

## AFFIDAVIT OF JAMES NOLE

James Nole, being duly sworn, deposes and states:

1.  I am submitting this affidavit voluntarily in connection with the opposition of Plaintiff Daniel J. Sullivan ("Sullivan") to the motion of Defendants William K. Woodruff III ("Woodruff"), Woodruff Family Trust ("WFL") and Optical Switch Corporation ("OSC") (hereinafter jointly referred to as "Defendants") to dismiss the within complaint against them. Unless otherwise noted, I submit this affidavit on personal knowledge of the matters recited herein. I currently am a resident of Lexington, Massachusetts and work as a private consultant.

2.  I understand that Sullivan has filed this lawsuit in Massachusetts asserting he is not liable to any of the Defendants for matters involving investments in Holographic Lithography Systems, Inc. ("HLS") and the acquisition of HLS by OSC. I further understand that Defendants have moved to dismiss the Sullivan lawsuit asserting this Court has no personal

9701652.2.LITIGATION

jurisdiction over Defendants. I am not a lawyer and do not purport to understand the legal bases for Defendants' challenge to this Court's jurisdiction. I am, however, personally aware that Defendants engaged in many activities in Massachusetts in connection with the investment in HLS and the acquisition of HLS by OSC. I have been advised that those activities of Defendants in Massachusetts may be relevant to this Court's decision on Defendants' motion to dismiss, and therefore I am submitting this affidavit to recite those activities for this Court's consideration.

3.  From approximately 1996 to May 2000, I was employed by HLS which was located in Bedford, Massachusetts. HLS was formed to develop a proprietary, patented lithography tool and process capable of high resolution lithography. I worked on the business development side of HLS, focusing on the application/marketing for the patented lithography tools, and also was active in establishing company business objectives and capital requirements. I worked with Sullivan, who, as President of HLS, was responsible for all non-technical aspects of HLS. I was one of the founding employees of HLS and was deeply involved with the development of the technology created by HLS as it relates to meeting customer and application requirements, and am familiar with the operations of the Bedford, Massachusetts facility by virtue of having worked out of there during my entire tenure with HLS and OSC. My knowledge of the events in question is based on my experience as an employee of HLS and of OSC.

A.  **Woodruff Invests in HLS**

4.  In mid-1998 I became aware that Sullivan had spoken with his friend Gary Nabhan ("Nabhan") about HLS. My understanding is that Nabhan, when hearing about HLS and the pending sale of the first HLS tool system to Hewlett Packard, commented that his boss, Woodruff, might be interested in investing in HLS.

-2-

5. In approximately June of 1998, Nabhan visited HLS' office in Bedford to conduct due diligence relating to Woodruff's potential investment in HLS. Nabhan was accompanied by Bart Stuck, who I understood was an expert in electro-optics, to examine HLS' technology as part of the due diligence. I, along with the technical staff at HLS, met with both Nabhan and Stuck and demonstrated HLS' technology and its possibilities for them. Nabhan and Stuck were also shown HLS' business plan and were provided full access to other employees of HLS with knowledge of HLS' technology.

6. After Nabhan and Stuck visited Bedford, Massachusetts, it is my understanding that Woodruff invested $2,000,000 in HLS on behalf of WFL. To my knowledge, no one from HLS went to Texas in connection with the WFL investment.

B.  **OSC Purchases HLS**

7. In early 2000, I met with representatives of OSC who visited HLS in Bedford, Massachusetts on at least two occasions for the purpose of looking into the possibility of using HLS' technology in OSC's optical switches. During these visits, HLS produced samples of its capabilities for OSC to analyze. I personally met with Robert Gardner, OSC's Director of Product Development and Engineering, and Gary Nabhan, OSC's Chief Executive Officer, in Bedford, MA to discuss HLS' and OSC's technology. The initial focus of these meetings was to persuade OSC to utilize HLS as a vendor for certain applicable technologies that could aid their optical switch efforts. After reviewing all of HLS capabilities, the representatives of OSC became interested in the many possibilities HLS technology offered as it related to current optical switching technologies as well as future, "solid state" (photonic band-gap) potential. Such photonic band gap technology was the hot topic within the field of optical switching.

8. In May 2000, HLS and OSC entered into an Asset Purchase Agreement, pursuant to which OSC acquired the assets of HLS. Before the acquisition occurred, I had numerous telephone conversations from Massachusetts with OSC representatives, including Nabhan, prior to the execution of the Asset Purchase Agreement. I recall that numerous high-level employees of OSC, perhaps as many as ten, and other representatives of OSC visited Bedford, Massachusetts to examine HLS' technology. After this acquisition, HLS no longer was an operating company, and the business of HLS was conducted as the Microphotonics Group of OSC. From May 2000 to August 2002, I was an employee of OSC at its Bedford, Massachusetts location.

9. After the acquisition, OSC maintained the office in Bedford, Massachusetts, and I worked for OSC in Massachusetts as a sales manager for the Microphotonics Group (the Bedford facility). After the acquisition, the Bedford, Massachusetts facility of OSC grew from 7 employees to over 40. Shortly after the acquisition, OSC infused $3-4 million into the Bedford operations, and I understand the Texas operations were eventually downsized substantially.

C. **Communications with Woodruff in Massachusetts**

10. I understand that Woodruff was a director and controlling shareholder of OSC. I had not met or heard from Woodruff until after the firing of Nabhan in December 2001.

11. In or around December 2001, Nabhan was removed as director and CEO of OSC and Woodruff assumed the position of Chairman, President, and CEO of OSC. Immediately after Nabhan was removed, Woodruff became very active in OSC including the Bedford, Massachusetts facility (Microphotonics Group) along with the new executive management team he assembled including Ron Pederson and Phil Congdon. Woodruff made many visits to

-4-

Bedford as the new Chairman, President, and CEO of OSC during my remaining time with the company.

12. In January 2002, I met with Woodruff in Bedford and discussed all aspects of the Bedford operations with him during his visit. During this visit he assembled the entire Microphotonics Group team to explain that the change in management should be considered a positive, that the new executive management team would be evaluating all OSC activities (including the Texas based optical switching portion of the company and the Bedford, Massachusetts based Microphotonics Group) to determine the proper strategy for the company to become successful. It was described by both Woodruff and Pederson during this speech to the Microphotonics Group that it would be necessary to raise additional capital to move the company forward, and that once they had a solid understanding of all company technologies and the financial potential of such technologies, they would prepare a business plan in order to raise capital. They anticipated this process would take 4-8 weeks, with the business plan targeted for completion by the end of February 2002. During the period from January through the end of my employment, it was stated on many occasions that the business plan was nearly complete and that both Woodruff and Pederson had met with many potential investors, and that raising capital was not a problem. While this plan was never completed, it was clear that Woodruff was intimately involved with the activities of the Microphotonics Group in Bedford, Massachusetts while he was purportedly preparing the plan.

13. Between January and April 2002, I worked closely with Woodruff, who visited the Bedford facility every month, sometimes as often as every other week. I also had weekly telephone conversations from Massachusetts with Woodruff concerning the Bedford facility. Woodruff participated in meetings with potential Microphotonics Group customers. During this

time he was given every piece of information related to the Microphotonics Group application portfolio, including customer names, forecasts, etc.... He was also detailed on future applications that would take time and funds to develop but provided a large back end opportunity. Specifically, he became very involved in understanding the potential use of the patented lithography tools developed by HLS/OSC for use within the semiconductor field (the majority of all lithography tools are sold to the semiconductor industry, which had great appeal for Woodruff; such a large opportunity, even with significant development effort required, would have been of great assistance in their proposed fund raising efforts). Woodruff hired at least one well known consultant from the semiconductor field and participated in several meetings with this consultant at our Bedford facility gaining an understanding of current capabilities of these tool systems and potential strategies for addressing semiconductor requirements. It is my understanding that he also participated in meetings and/or discussions with potential corporate partners from the semiconductor field who had interest in learning more about these tool systems.

14.     Between January and April 2002, Woodruff also had regular contact (I understand it was daily) with engineers in the Bedford facility both during his visits to Bedford, and by telephone.

15. In or around August 2002, Dan Gardner, the Manufacturing Manager of OSC, was sent from Texas to Massachusetts to act as the General Manager of the Bedford facility. It is my understanding that Woodruff was in daily telephone contact with Mr. Gardner in Massachusetts.

16. In August 2002, my employment relationship with OSC was terminated.

Signed under the pains and penalties of perjury this 1 day of July, 2005.

*[signature]*
James Nole